1   ROB BONTA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   JOEL MARRERO
    Supervising Deputy Attorney General
4   HEIDI JOYA
    LAUREN GREENAWALT
5   JONATHAN BENNER
    ALEX FLORES
6   JARRELL E. MITCHELL
    Deputy Attorneys General
7   State Bar No. 305055
      300 South Spring Street
8     Los Angeles, CA 90013
      Telephone: (213) 269-6562
9     E-mail: Jarrell.Mitchell@doj.ca.gov
    *Attorneys for Plaintiff State of California*

10

11                  IN THE UNITED STATES DISTRICT COURT

12              FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                       SAN FRANCISCO DIVISION

14

15  | STATE OF ILLINOIS; STATE OF CALIFORNIA; | |
    | DISTRICT OF COLUMBIA; STATE OF | **COMPLAINT FOR DECLARATORY** |
16  | ARIZONA; STATE OF COLORADO; STATE OF | **AND INJUNCTIVE RELIEF** |
    | CONNECTICUT; STATE OF DELAWARE; | |
17  | STATE OF HAWAI'I; STATE OF MAINE; | Administrative Procedure Act |
    | STATE OF MARYLAND; COMMONWEALTH | |
18  | OF MASSACHUSETTS; STATE OF MICHIGAN; | Date: |
    | STATE OF NEW JERSEY; STATE OF RHODE | Time: |
19  | ISLAND; STATE OF VERMONT; AND STATE | Courtroom: |
    | OF WASHINGTON, | Judge: |
20  | | Trial Date: |
    | Plaintiffs, | Action Filed: |
21  | v. | |
22  | | |
    | UNITED STATES DEPARTMENT OF HOUSING | |
23  | AND URBAN DEVELOPMENT; ERIC SCOTT | |
    | TURNER, in his official capacity as Secretary of the | |
24  | U.S. Department of Housing and Urban | |
    | Development; CRAIG TRAINOR, in his official | |
25  | capacity as Assistant Secretary for the Office of Fair | |
    | Housing and Equal Opportunity; and the UNITED | |
26  | STATES OF AMERICA, | |
27  | Defendants. | |

28

1

**INTRODUCTION**

1.      The Department of Housing and Urban Development ("HUD") seeks to force states to jettison their protections against housing discrimination. In seemingly mundane guidance issued to state and local fair housing enforcement agencies, HUD included an unprecedented reversal of longstanding law and imposed numerous unlawful conditions on federal funding. HUD's guidance, if implemented, would eviscerate the federal-state partnership Congress created to enforce the Fair Housing Act ("FHA"), gut Plaintiffs' ability to ensure equal access to housing nationwide, and weaken fair housing enforcement.

2.      Sixty years ago, Congress enacted the FHA to address the pervasive nationwide problem of housing discrimination and charged HUD with its enforcement. Given the enormity of the task, Congress envisioned a robust partnership between HUD and state and local agencies to enforce this landmark civil rights law. This partnership has taken the form of the Fair Housing Assistance Program ("FHAP"). Through the FHAP, HUD refers allegations of housing discrimination to state and local agencies whose own fair housing laws are substantially equivalent to—that is, have at least the same protections as—the FHA for investigation, conciliation, and enforcement. FHAP agencies utilize HUD funds to process housing discrimination complaints, train staff, and engage in community outreach and education. The FHAP has enjoyed bipartisan support and stable funding since it was established in 1980—until now.

3.      In September 2025, Defendants issued written guidance to state and local FHAP agencies that dramatically undermines the program. First, the guidance threatens to decertify state and local FHAP agencies—thereby cutting off complaint referrals and funding—unless they stop enforcing state and local fair housing protections that exceed those in Defendants' narrow conception of the FHA, including protections for sexual orientation, gender identity or expression, language, criminal records, and source of income. HUD's attempt to coerce Plaintiffs to abandon their fair housing protections conflicts with the FHA, violates HUD's own regulations, and reverses decades of practice.

4.     In addition, Defendants' guidance threatens to withhold funds for FHA enforcement from FHAP agencies that do not abide by a series of vague, arbitrary, and unlawful conditions. Specifically, the guidance bars FHAP agencies from using funds to "promote gender ideology," "fund or promote elective abortions," or promote illegal immigration. It also purports to prohibit FHAP agencies from pursuing claims premised on disparate impact liability, even where the agency's own law allows for disparate impact as a cognizable theory of liability.

5.     This is not the first time HUD has tried to take a sledgehammer to FHA enforcement during this administration—first, by eliminating virtually all the employees and expertise in the HUD Office of Fair Housing and Equal Opportunity ("FHEO"), resulting in HUD charging almost no new discrimination complaints last year, and then by unsuccessfully attempting to cut funding for the Fair Housing Initiatives Program ("FHIP"), which provides funding to nonprofits to enforce the FHA.

6.     This is the latest attempt by the executive branch to leverage federal programs to achieve unrelated policy goals that thwart Congress' will and infringe upon state sovereignty. Courts have consistently rejected the administration's efforts to weaponize federal programs in this manner.

7.     Defendants lack authority to restructure Congress' civil rights enforcement scheme, suppress enforcement of housing discrimination protections, or coerce states to weaken or disregard their own laws as a condition of receiving funds appropriated to enforce the FHA. Defendants' actions violate the Administrative Procedure Act ("APA") and the United States Constitution, and threaten to dismantle a crucial mechanism for combatting housing discrimination in the United States.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2201(a).

9.     The Court has authority to grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702, 705, and 706.

10.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1).

Complaint for Declaratory and Injunctive Relief

11.    Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rules 3-2(c)-(d) and 3-5(b), because Plaintiff State of California and Defendant HUD maintain offices in the Division.

**PARTIES**

12.    Plaintiff State of Illinois, acting by and through its Attorney General Kwame Raoul, is a sovereign state of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter. The Illinois Department of Human Rights ("IDHR") is an agency of the State of Illinois and has had a work sharing relationship with HUD under the FHAP since 2002.

13.    Plaintiff State of California, acting by and through its Attorney General Rob Bonta, is a sovereign state of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter. The California Civil Rights Department ("CRD") is a department of the State of California and has had a work sharing relationship with HUD under the FHAP since 1997.

14.    Plaintiff District of Columbia, acting by and through its Attorney General Brian Schwalb, is a municipal corporation organized under the Constitution of the United States. It is the local government for the territory constituting the permanent seat of the federal government. As the District's chief legal officer, the Attorney General is authorized to act on behalf of the District in this matter. The Office of Human Rights ("OHR") is an executive agency of the District of Columbia and has had a work sharing relationship with HUD under the FHAP since 2000.

15.    Plaintiff State of Arizona, acting by and through its Attorney General Kris Mayes, is a sovereign state of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter. The Arizona Attorney General Office's Civil Rights Division ("ACRD") has had a work sharing relationship with HUD under the FHAP since around 1991.

16.    Plaintiff the State of Colorado, represented by and through the Attorney General, is a sovereign state of the United States of America. Attorney General Philip J. Weiser acts as the

4

1   chief legal representative of the State and is authorized to pursue this action. Colo. Rev. Stat.

2   § 24-31-101. The Colorado Civil Rights Division ("CCRD") is a division of the State of Colorado

3   and has participated in the FHAP program since 1992.

4        17.    Plaintiff State of Connecticut, acting by and through its Attorney General William

5   Tong, is a sovereign state of the United States of America. As the State's chief legal officer, the

6   Attorney General is authorized to act on behalf of the State in this matter. The Connecticut

7   Commission on Human Rights and Opportunities ("CHRO") is an agency of the State of

8   Connecticut and has had a work sharing relationship with HUD under the FHAP for

9   approximately 30 years.

10       18.    Plaintiff State of Delaware is a sovereign state of the United States of America. This

11  action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the

12  "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403

13  (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of

14  Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504. The Delaware

15  Division of Human and Civil Rights ("DHCR") is an agency of the State of Delaware and has

16  participated continuously in HUD's FHAP for more than 30 years.

17       19.    Plaintiff State of Hawai'i, acting by and through its Attorney General Anne E. Lopez,

18  is a sovereign state of the United States of America. As the State's chief legal officer, the

19  Attorney General is authorized to act on behalf of the State in this matter. The Hawai'i Civil

20  Rights Commission ("HCRC") is an agency of the State of Hawai'i and has had a work sharing

21  relationship with HUD under the FHAP since 1993.

22       20.    Plaintiff the State of Maine is a sovereign state of the United States of America.

23  Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is

24  authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191. The Maine Human

25  Rights Commission ("MHRC") is an agency of the State of Maine and has been certified as a

26  substantially equivalent FHAP agency since at least 2009.

27       21.    Plaintiff State of Maryland, acting by and through its Attorney General Anthony G.

28  Brown, is a sovereign state of the United States of America. As the State's chief legal officer, the

1    Attorney General is authorized to act on behalf of the State in this matter. The Maryland

2    Commission on Civil Rights is an agency of the State of Maryland and has been designated as a

3    FHAP agency for over 20 years.

4         22.    Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States

5    of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the

6    chief law enforcement officer of Massachusetts. The Massachusetts Commission Against

7    Discrimination ("MCAD") is an agency of the Commonwealth of Massachusetts and has

8    participated in HUD's FHAP since 1994.

9         23.    Plaintiff State of Michigan is a sovereign state of the United States of America.

10    Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement

11    officer of Michigan. The Michigan Department of Civil Rights ("MDCR") is an agency of the

12    State of Michigan and has participated in HUD's FHAP for more than 30 years.

13        24.    Plaintiff State of New Jersey, acting by and through its Attorney General Jennifer

14    Davenport, is a sovereign state of the United States of America. As the State's chief legal officer,

15    the Attorney General is authorized to act on behalf of the State in this matter. The New Jersey

16    Division on Civil Rights ("DCR") is an agency of the State of New Jersey and has participated in

17    the FHAP since 2006.

18        25.    The State of Rhode Island is a sovereign state in the United States of America. Rhode

19    Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement

20    officer of Rhode Island. The Rhode Island Commission for Human Rights is an agency of the

21    State of Rhode Island and participates in the FHAP through a work sharing agreement with HUD.

22        26.    Plaintiff State of Vermont, acting by and through its Attorney General Charity R.

23    Clark, is a sovereign state of the United States of America. As the State's chief legal officer, the

24    Attorney General is authorized to act on behalf of the State in this matter. The Vermont Human

25    Rights Commission ("VHRC") is an agency of the State of Vermont and has had a work sharing

26    relationship with HUD under the FHAP since 2001.

27        27.    Plaintiff State of Washington, acting by and through its Attorney General Nicholas

28    W. Brown, is a sovereign state of the United States of America. As the State's chief legal officer,

the Attorney General is authorized to act on behalf of the State in this matter. The Washington

State Human Rights Commission is an agency of the State of Washington and has had a work

sharing relationship with HUD under the FHAP since at least 1997.

28.     Collectively, Plaintiffs' FHAP agencies are referred to as "Plaintiff agencies."

29.     Defendant HUD is an executive branch department of the United States government.

42 U.S.C. § 3532(a). HUD administers a variety of federal housing programs and grants,

including the FHAP. HUD is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

30.     Defendant Eric Scott Turner is the Secretary of Housing and Urban Development and

is HUD's highest ranking official. He is sued in his official capacity.

31.     Defendant Craig Trainor is the Assistant Secretary for FHEO. He administers HUD's

programs that enforce the FHA and other federal civil rights laws, including the FHAP. He is

sued in his official capacity.

32.     The United States of America is responsible for the exercise of executive actions

by the named Defendants and all other agencies that are directed to take action with respect to the

Challenged Provisions. Defendant United States of America may be named as a defendant in any

action seeking relief other than money damages against the United States. *See* 5 U.S.C. § 702.

## ALLEGATIONS

I.     FAIR HOUSING ENFORCEMENT IN THE UNITED STATES

A.     **The Cooperative Enforcement Regime Envisioned by the Fair Housing Act**

33.     In 1968, Congress enacted the FHA "to provide, within constitutional limitations, for

fair housing throughout the United States." Pub. L. No. 90-284, § 801, 82 Stat. 81 (Apr. 11, 1968)

(codified at 42 U.S.C. § 3601). The FHA initially prohibited housing discrimination based on

race, color, religion, and national origin. *Id.* § 804, 82 Stat. at 83. Sex was added as a protected

class in 1974. *See* Pub. L. 93-383, § 808(b)(1), 88 Stat. 633, 729 (Aug. 22, 1974). In 1988,

Congress added disability[1] and familial status as protected classes. Pub. L. No. 100-430, § 6, 102

Stat. 1619, 1619-22 (Sep. 13, 1988).

---

[1] The FHA uses the term "handicap," which is disfavored by people with disabilities. "Disability" has the same legal meaning.

34.    Although Congress charged HUD with enforcing the FHA, it also envisioned HUD would rely heavily on state and local agencies to "provid[e] rights and remedies for alleged discriminatory housing practices which are substantially equivalent to" those of the FHA. Pub. L. No. 90-284, § 810(c), 82 Stat. at 86; *see also id.* § 808, 82 Stat. at 84. Where there is a "substantially equivalent" state or local fair housing law, HUD "shall notify" the appropriate agency of "any" complaint "which appears to constitute a violation of such State or local fair housing law." *Id.* § 810(c), 82 Stat. at 86; *see also id.* § 816, 82 Stat. at 89. By enforcing state and local fair housing laws that are substantially equivalent, agencies would, in effect, also enforce the FHA.

35.    Underscoring Congress' intent for state and local agencies to take the lead in fair housing enforcement, the FHA instructed HUD presumptively to "take no further action" as to complaints referred to a substantially equivalent state or local agency. *See id.* § 810(c), 82 Stat. at 86; *see also* 42 U.S.C. § 3610(f)(2).

36.    Although twenty-seven states and sixteen local jurisdictions had been recognized as substantially equivalent on an interim basis by early 1975, HUD recognized that federal funding was essential to increase state and local agencies' enforcement capacity. *See* The Fair Housing Assistance Program; Eligibility Criteria and Funding Standards, 45 Fed. Reg. 31,880, 31,880-81 (May 14, 1980). Thus, in 1980, Congress established and funded the Fair Housing Assistance Program to catalyze a more expansive and robust enforcement network of state and local agencies. *Id.* The purpose of the FHAP is to "build a coordinated intergovernmental enforcement effort to further fair housing and to encourage the [FHAP] agencies to assume a greater share of the responsibility for the administration and enforcement of fair housing laws." 24 C.F.R. § 115.300.

37.    The FHAP was designed to provide assistance and reimbursement to state and local agencies to: (1) process dual-filed complaints (i.e., complaints filed with both HUD and a FHAP agency); (2) provide training under federal, state, and local fair housing law; (3) provide technical assistance; (4) create and maintain data and information systems; and (5) develop and enhance

fair housing education and outreach projects, special fair housing enforcement efforts, fair housing partnership initiatives, and other fair housing projects. 24 C.F.R. § 115.300.

38.    In 1988, Congress passed the Fair Housing Amendments Act ("FHAA") to further strengthen fair housing enforcement. *See* Pub. L. No. 100-430, 102 Stat. 1619 (Sep. 13, 1988). In addition to expanding the FHA's protected classes, the FHAA established a statutory process— including substantive criteria—for certifying state and local fair housing agencies as substantially equivalent. 42 U.S.C. § 3610(f). This change reflected a shift from infrequent, case-by-case referral to full partnership between FHAP agencies and HUD. *See* U.S. Comm'n on C.R., *The Fair Housing Amendments Act of 1988: The Enforcement Report* 92-93 (Sep. 1994), https://www.usccr.gov/files/historical/1994/94-013.pdf.

39.    Congress has consistently appropriated FHAP funds since 1980. In fiscal year 2024 alone, Plaintiff agencies received approximately $10.7 million from HUD under the FHAP.

40.    FHAP agencies play a critical role in addressing housing discrimination. In 2024, FHAP agencies received 6,754 discrimination complaints, an increase of almost 200 complaints from the previous year. *See* Nat'l Fair Hous. All., *2025 Fair Housing Trends Report* 15 (2025), https://nationalfairhousing.org/wp-content/uploads/2025/11/2025-NFHA-Fair-Housing-Trends-Report.pdf. FHAP agencies processed four times as many fair housing complaints in 2024 as HUD and the United States Department of Justice combined. *See id.* at 5. Yet housing discrimination remains a major problem. *See, e.g.*, *id.* at 4 (noting that "discrimination in housing remains both pervasive and persistent, demanding continued vigilance and enforcement").

**B.    HUD Must Certify State and Local Agencies that Enforce Fair Housing Laws with More Expansive Protections than the FHA as Substantially Equivalent.**

41.    Under the FHA, HUD "may certify an agency" as substantially equivalent "only if" it determines that:

> (i) the substantive rights protected by such agency in the jurisdiction with respect to which certification is to be made;
> (ii) the procedures followed by such agency;
> (iii) the remedies available to such agency; and
> (iv) the availability of judicial review of such agency's action;
> are substantially equivalent to those created by and under [the FHA].

1    42 U.S.C. § 3610(f)(3)(A).

2        42.    There are two phases of substantial equivalency certification: (1) adequacy of law, or

3    "whether on its face, the fair housing law that the agency administers provides rights, procedures

4    remedies, and the availability of judicial review" that are substantially equivalent to the FHA; and

5    (2) adequacy of performance, or whether "in operation" the state or local fair housing law the

6    agency administers is substantially equivalent to the FHA. 24 C.F.R. § 115.201. A state or local

7    fair housing agency may receive interim certification after passing the adequacy of law phase and

8    full certification after passing the adequacy of performance stage. *Id.*

9        43.    The FHA does not restrict the ability of states or localities to provide more expansive

10   protections than the FHA. 42 U.S.C. § 3615 (the FHA does not "invalidate or limit any law of a

11   State or political subdivision of a State," except those that "require or permit" discriminatory

12   housing practices prohibited by the FHA); *see also Hunter v. Erickson*, 393 U.S. 385, 388-89

13   (1969) (holding that the FHA does not preempt state and local fair housing laws with more robust

14   protections than the FHA).

15       44.    Consistent with that statutory directive, HUD's substantial equivalency regulations

16   permit state and local agencies to enforce fair housing laws that go beyond the protections of the

17   FHA.

18       45.    Under HUD's regulations, if a state or local law "is different than the [FHA] in a way

19   that does not diminish coverage of the [FHA], including, but not limited to, the protection of

20   additional prohibited bases, then the state or local law may still be found substantially

21   equivalent." 24 C.F.R. § 115.204(h). This regulation, finalized in 2007 and still in effect, codified

22   "the long-standing HUD policy that the inclusion of additional prohibited bases in a state or local

23   law does not preclude HUD from determining that a given law is substantially equivalent to the

24   Fair Housing Act." Certification and Funding of State and Local Fair Housing Enforcement

25   Agencies, 72 Fed. Reg. 19,070, 19,071 (Apr. 16, 2007) ("2007 FHAP Funding Regulation").

26       46.    FHAP agencies have relied on this substantial equivalence standard since the

27   program's inception in 1980. In fact, even today, HUD's public-facing website advises that "[t]o

28   obtain certification, a state or local agency must have a law that, at a minimum, prohibits

discrimination against the same protected classes as the Fair Housing Act," and that a

"substantially equivalent agency's law may include additional protected classes." U.S. Dep't of

Hous. & Urb. Dev., *Fair Housing Assistance Program (FHAP)*,

https://www.hud.gov/stat/fheo/assistance-program [https://perma.cc/QGZ5-QUC3] (last visited

Mar. 13, 2026).

**C.    HUD Enters into Agreements with State and Local Agencies to Facilitate Enforcement of the FHA.**

47.    Once HUD certifies an agency as substantially equivalent, it "may enter into a

Memorandum of Understanding (MOU) with the agency," 24 C.F.R. § 115.205(a)(1), under

which HUD refers housing discrimination complaints to the agency for investigation,

conciliation, and enforcement. *See* 24 C.F.R. § 115.206(d) (noting that, among other things,

FHAP agencies are assessed on investigation, conciliation, and enforcement).

48.    To implement the MOU, HUD provides funds to FHAP agencies every fiscal year

through cooperative agreements, which include "attachments and/or appendices establishing

requirements relating to the operation and performance of the agency." 24 C.F.R. § 115.100(c);

*see also* 31 U.S.C. § 6305 ("An executive agency shall use a cooperative agreement . . . when . . .

substantial involvement is expected between the executive agency and the State, local

government, or other recipient when carrying out the activity contemplated in the agreement.").

49.    The amount of complaint processing funds a FHAP agency receives each year is

based on the number of complaints processed by the agency and accepted for payment by HUD

within the twelve-month period identified in the cooperative agreement. 24 C.F.R. §

115.304(b)(1). HUD determines whether cases are "acceptably processed" using the

"requirements enumerated in the cooperative agreement and its attachments/appendices,

performance standards set forth in 24 CFR § 115.206, and provisions of the interim agreement or

MOU." *Id.*

50.    HUD typically reimburses a FHAP agency at the end of the federal government's

fiscal year for eligible complaints already processed by the agency during the complaint

processing period.

51. Since the start of the FHAP, HUD reimbursed agencies for complaints that alleged discrimination based on multiple traits—even if one such trait was not protected by the FHA—as long as at least one trait was protected by the FHA. For example, HUD would reimburse for complaints that alleged discrimination based on both race and veteran status, where veteran status was only protected by the state or local agency's fair housing law, because the FHA specifically covers race.

52. Unlike HUD's usual practice, Plaintiffs did not receive their fiscal year 2025 cooperative agreements by the end of 2025. In March 2026, Defendants contacted FHAP agencies by email to provide agencies' cooperative agreements. Those agreements state FHAP agencies "must comply" with, among other things, fiscal year 2025 FHAP Guidance, described below.

## II. DEFENDANTS ISSUE UNLAWFUL GUIDANCE TO PLAINTIFF AGENCIES.

53. In September 2025, Defendants issued their Fiscal Year 2025 FHAP Funding Guidance Package ("Guidance Package") to FHAP agencies. Under HUD regulations, the Guidance Package is incorporated into FHAP agencies' annual cooperative agreements. *See* 24 C.F.R. § 115.100(c). The Guidance Package radically reshapes the FHAP and threatens to dramatically weaken fair housing enforcement nationwide. It also attempts to curtail Plaintiffs' ability to enforce their own fair housing laws.

54. The Guidance Package consists of three documents, attached to this Complaint as Exhibit A:

  a. an undated transmittal memorandum from Nathan S. Roth, Acting Director of Office of Programs for FHEO, to FHAP Agency Directors, with the subject line, "Transmittal Memo: FY2025 Guidance Package for the Fair Housing Assistance Program" ("Transmittal Memo");

  b. the Fiscal Year 2025 FHAP Funding Guidance, including six attachments (Attachments A-F) ("Guidance"); and

  c. a September 17, 2025, memorandum from John Gibbs, Principal Deputy Assistant Secretary for FHEO to the Office of FHEO, FHAP agencies,

and FHIP grantees, with the subject line, "Notice of the Withdrawal of FHEO Guidance Documents."

55.    The Guidance Package announces two major changes that are challenged here: (1) the reversal of HUD's longstanding substantial equivalence standard and related reimbursement policy (collectively, "Change in Fair Housing Enforcement Policy"), and (2) the addition of vague and unrelated funding conditions that have never before been imposed on FHAP agencies ("Attachment F Conditions") (collectively, "the Challenged Provisions").

### A.    Change in Fair Housing Enforcement Policy

56.    The FHA establishes a floor—not a ceiling—for protections against housing discrimination. *See supra* ¶¶ 43-46. Through the Guidance Package, however, HUD has announced—without explanation and without undergoing notice-and-comment rulemaking—that it intends to ignore this principle, found in the text of the FHA and HUD's own regulations and guidance. The Guidance Package weakens fair housing enforcement by threatening to revoke substantial equivalence certification for agencies whose fair housing laws recognize additional protected classes beyond those expressly enumerated in the FHA and by threatening to deny reimbursement to FHAP agencies for cases that involve both an FHA-protected basis and one or more bases not expressly enumerated in the FHA.

### 1.    Change in Substantial Equivalence Policy

57.    The Guidance Package threatens to revoke FHAP agencies' substantial equivalence certifications if they enforce fair housing laws that "grant substantive rights outside the seven protected traits found in the federal Fair Housing Act." Transmittal Memo at 2. The Guidance expressly states the "[FHA] does not include protections for sexual orientation, gender identity, and gender expression; 'source of income'; criminal records; weight and height; or limited English proficiency." *Id.* at 1.

58.    The Guidance Package warns that, in fiscal year 2026, FHEO will review FHAP agencies' agreements and operations "to ensure adequacy of law." Transmittal Memo at 2. Those agencies governed by fair housing laws that include protected bases not included in the FHA "risk having their substantial equivalency certification revoked." *Id.*

59.     Many of these disfavored bases are explicitly covered by Plaintiff agencies' fair housing laws. For example, California enforces fair housing protections for age, gender, gender identity, gender expression, sexual orientation, marital status, ancestry, source of income, veteran or military status, and genetic information. Cal. Gov't Code § 12955; *see also* Cal. Civ. Code § 51. Illinois' fair housing law prohibits discrimination based on ancestry, age, marital status, order of protection status, military status, sexual orientation, gender-related identity, pregnancy, reproductive health decisions, immigration status, source of income, and arrest record. 775 ILCS §§ 5/1-103, 5/3-102. These and other FHAP agencies now face the imminent threat of losing their substantial equivalence certifications and, thus, their access to critical FHAP funding.

60.     Although Plaintiffs disagree with HUD's overly restrictive interpretation of what is covered by the FHA, that is not at issue in this case. Rather, by threatening to revoke the substantial equivalence certifications of FHAP agencies whose laws include broader fair housing protections, HUD is attempting to coerce Plaintiffs into abandoning their own democratically enacted fair housing laws.

61.     To agree to this policy change and remain eligible for FHAP funding, Plaintiffs would have to amend their fair housing laws to mirror HUD's narrow construction of the FHA, reducing civil rights protections for their residents. But Congress expressly preserved states' and localities' ability to provide more robust protections against housing discrimination than the FHA. *See* 42 U.S.C. § 3615. Thus, the Guidance Package significantly and unlawfully encroaches on Plaintiffs' sovereignty.

### 2.     Change in Reimbursement Policy

62.     Consistent with its longstanding policy that FHAP agencies may enforce statutes whose protections exceed those of the FHA, HUD has traditionally reimbursed FHAP agencies for processing complaints that include a trait protected only by state or local law, as long as the complaint also alleges discrimination prohibited by the FHA.

63.     The Guidance Package, however, indicates that Defendants now intend to limit reimbursement to those complaints that have a "clear, primary basis in a prohibited characteristic that is covered by the plain language of the [FHA]." Transmittal Memo at 1. The Guidance

further states that any complaints based on "rights not expressly found in the federal Fair Housing Act and other relevant federal civil rights laws will not be reimbursed." *Id.* at 2.

64.   The meaning of this language is, at best, ambiguous. Language to this effect has not appeared in guidance sent by HUD for use in administering FHAP funds in prior fiscal years. *See, e.g.,* U.S. Dep't of Hous. & Urb. Dev. Off. of Fair Hous. & Equal Opportunity, *FY2024 Fair Housing Assistance Program (FHAP) Funding Guidance* (Apr. 28, 2024), https://ohr.dc.gov/sites/default/files/dc/sites/ohr/FY24%20FHAP%20Funding%20Package%20to%20Agencies.pdf. Many Plaintiff agencies reasonably have concluded that, going forward, HUD will apply the Guidance Package to deny reimbursement for cases that involve traits protected only by state or local law, even if the cases also include bases expressly protected by the FHA.

65.   That understanding is supported by the fact that, since early 2025, HUD has, in fact, rejected some complaints submitted by Plaintiff agencies for payment that involve allegations of discrimination related to both traits protected by the FHA and traits protected only by state or local law.

66.   As a result, since receipt of the Guidance Package, many Plaintiff agencies have begun to charge and process the state or local law bases of dual-basis complaints separately from the FHA bases and to submit only the FHA bases for HUD reimbursement. This allows the agency to vindicate the state or local right while also ensuring the explicitly FHA-protected basis will remain eligible for HUD reimbursement.

67.   This change has caused significant administrative burdens, as FHAP agencies have had to effectively process the same cases twice. Increasing administrative burdens will, in turn, increase the amount of time it takes to investigate discrimination complaints, which will substantially delay fair housing enforcement.

**B.   Attachment F Conditions**

68.   HUD also seeks to impose several terms and conditions that have never been included in HUD's cooperative agreements with FHAP agencies before. Entitled "Attachment F: Mandatory FHAP Grant Agreement Provisions," these new terms seek to impose conditions on FHAP funding on topics unrelated to housing discrimination, such as "gender ideology,"

abortion, and immigration, without explaining how fair housing enforcement could violate those conditions. Guidance Attach. F ¶¶ 1, 4, 8. In addition, at least one condition in Attachment F attempts to leverage FHAP funding to restrict Plaintiffs' ability to enforce their own housing discrimination laws that conflict with HUD's newfound policies. *See* Guidance Attach. F ¶ 7.

69.   HUD first previewed substantively similar funding conditions in its general grantmaking policy in or around April 2025.[2] Since then, it has sought to impose these conditions on several funding programs.[3] Those efforts have been consistently enjoined by the courts. *See infra* ¶ 87. Inclusion of these same unlawful conditions in the Guidance Package is HUD's latest effort to impose these terms on recipients of federal funding.

### 1.   Gender Ideology Condition (Condition 1)

70.   Attachment F provides that grantees "shall not use grant funds to promote 'gender ideology,' as defined in Executive Order (E.O.) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Guidance Attach. F ¶ 1 ("Gender Ideology Condition"); *see also* Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology EO").

71.   The Gender Ideology EO—which denies the existence of transgender and gender nonconforming individuals and seeks to exclude them from public life—declares that it is "the policy of the United States to recognize two sexes, male and female" that are "not changeable"

---

[2] U.S. Dep't of Hous. & Urb. Dev., *General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs*, https://www.hud.gov/sites/default/files/CFO/documents/Administrative-Requirements-Addendum-FY2025.pdf (listing compliance with several of President Trump's executive orders as a grant term and incorporating language from those executive orders into other standard grant terms).

[3] *E.g.*, Scott Turner (@Secretary Turner), X (Mar. 13, 2025, 11:47 A.M.), https://x.com/SecretaryTurner/status/1900257331184570703 [https://perma.cc/JUT2-6NHA] (last visited March 13, 2026) (announcing new funding conditions on CofC grant agreements requiring compliance with President Trump's executive orders, including the Gender Ideology, Anti-Abortion, and Immigration EOs); Letter from Claudette Fernandez, Gen. Deputy Assistant Sec'y, U.S. Dep't of Hous. & Urb. Dev. Off. of Cmty. Plan. and Dev., to Tess Hembree, Exec. Dir., Council of State Cmty. Dev. Agencies, and Vicki Watson, Exec. Dir., Nat'l Cmty. Dev. Ass'n 2 (Jun. 5, 2025), https://ncdaonline.org/wp-content/uploads/2025/06/6-5-2025-HUD-Response-to-COSCDA-NCDA.pdf (announcing that grant agreements in funding programs administered by HUD's Office of Community Planning and Development would require compliance with President Trump's executive orders, including the Gender Ideology, Anti-Abortion, and Immigration executive orders).

and that "the Executive Branch will enforce all sex-protective laws to promote this reality." Gender Ideology EO § 2. The EO directs federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," defined as "the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* §§ 2(f), 3(e). The EO also specifically directs HUD to repeal its longstanding 2016 Equal Access Rule, which requires HUD-funded housing, shelters, and services to provide equal access consistent with an individual's gender identity. *Id.* § 4(b).

72.    The Guidance Package does not explain what constitutes unlawful "gender ideology" or what it means to "promote gender ideology" in the fair housing enforcement context, where FHAP agencies engage in a range of activities to investigate and remediate housing discrimination, including, in some cases, enforcing state or local fair housing laws that expressly include protections for gender identity and expression. As such, it is impossible for Plaintiff agencies to knowingly agree to the Gender Ideology Condition.

### 2.    Anti-Abortion Condition (Condition 4)

73.    In addition, HUD seeks to impose an abortion-related funding condition on FHAP agencies. Attachment F provides that FHAP agencies "shall not use any grant funds to fund or promote elective abortions, as required by E.O. 14,182, Enforcing the Hyde Amendment." Guidance Attach. F ¶ 4 ("Anti-Abortion Condition"); *see also* Exec. Order No. 14,182, 90 Fed. Reg. 8751 (Jan. 24, 2025) ("Anti-Abortion EO").

74.    The Anti-Abortion EO declares that it is the policy of the United States "to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." Anti-Abortion EO § 1. The EO itself does not explain what it means to "promote" elective abortions, but the U.S. Office of Management and Budget has explained that taxpayer funds are not to be used "to fund, facilitate, or promote abortion, including travel or transportation to obtain an abortion, consistent with the Hyde Amendment and other statutory restrictions on taxpayer funding for abortion." Memorandum from Matthew J. Vaeth, Acting Dir., Off. of Mgmt. & Budget, to the Heads of Exec. Dep'ts & Agencies 1 (Jan. 24, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-12-Memorandum-on-Hyde-Amendment-EO.pdf ("OMB Memo").

75.    The Hyde Amendment is a rider included in annual Department of Health and Human Services appropriations bills that, in its most recent iteration, generally prohibits the use of certain funds "for any abortion" and for some other abortion-related expenses, subject to certain exceptions. Pub. L. No. 118-47, Div. D, §§ 506, 507, 138 Stat. 460, 703 (Mar. 23, 2024).[4] The Hyde Amendment does not prohibit "facilitat[ing]" or "promot[ing]" abortions and does not apply to HUD appropriations. The HUD funding provisions of the Consolidated Appropriations Act of 2026 do not include a Hyde Amendment rider. Pub. L. No. 119-75, 140 Stat. 173, 209-51 (Feb. 3, 2026). Thus, the Hyde Amendment is irrelevant to the fair housing enforcement work conducted by FHAP agencies.

76.    The Guidance Package fails to explain what it means to "facilitate" or "promote" abortion, how FHAP agencies might do so, whether state or local protections based on reproductive health decisions run afoul of this provision, or why this condition, which is wholly unrelated to the administration of fair housing law, is being imposed upon FHAP funding recipients.

### 3.    Disparate Impact Condition (Condition 7)

77.    Attachment F requires that FHAP agencies "not issue findings utilizing disparate impact liability as defined by Executive Order 14281 (Restoring Equality of Opportunity and Meritocracy)," Guidance Attach. F ¶ 7 ("Disparate Impact Condition"); *see also* Exec. Order 14,281 § 2, 90 Fed. Reg. 17,537, 17,537 (Apr. 28, 2025) ("Disparate Impact EO").

78.    The Disparate Impact EO seeks to eliminate disparate impact liability in "all contexts to the maximum degree" and declares that "[d]isparate-impact liability imperils the effectiveness of civil rights laws." Disparate Impact EO § 1. Thus, the Disparate Impact EO mandates that all agencies "deprioritize enforcement of all statutes and regulations to the extent they include disparate-impact liability." *Id.* § 4.

---

[4] Restrictions and exceptions similar to those in the Hyde Amendment apply to appropriations for certain other agencies, *see, e.g.*, Pub. L. No. 118-42, §§ 202, 203, 138 Stat. 25, 153 (Mar. 9, 2024) (Department of Justice); 10 U.S.C. § 1093 (Department of Defense), but there is no similar statutory restriction on HUD's funding. *See* OMB Memo at 1.

79.    The FHA expressly preserves Plaintiffs' rights to enact and enforce fair housing laws that provide broader protections than the FHA, as long as those laws do not permit conduct prohibited by the FHA. 42 U.S.C. § 3615; *see also* 24 C.F.R. 115.204(h); *Hunter*, 393 U.S. at 388-389.

80.    The Guidance does not explain whether HUD considered how this change in position is consistent with Section 3615 or 24 C.F.R. § 115.204(h), or how this change will impact Plaintiff agencies' ability to enforce their own housing discrimination laws.

81.    Disparate impact liability is available to several Plaintiff states to enforce their fair housing laws. *See, e.g.*, *Hare v. David S. Brown Enters., Ltd.*, 340 A.3d 698, 714-16 (Md. 2025). In addition, several Plaintiffs have enacted fair housing laws that specifically authorize disparate impact liability. *See, e.g.*, Cal. Gov't Code § 12955.8(b); 775 ILCS § 5/3-102(H). To condition funding on Plaintiffs' agreement to abandon disparate impact liability as defined in the Disparate Impact EO would prevent FHAP agencies from issuing disparate impact findings under their own fair housing laws. HUD's effort to prevent Plaintiffs from fully enforcing their own fair housing laws will undermine the FHAP's effectiveness, weaken fair housing protections across the country, and infringe on Plaintiffs' sovereignty.

82.    Plaintiffs not only have an interest in enforcing their own fair housing laws, but also a reliance interest in HUD's longstanding practice of allowing FHAP agencies' fair housing laws to afford more protections than those in the FHA. Defendants fail to account for these interests in their sudden departure from past practice.

### 4.    Immigration Condition (Condition 8)

83.    Lastly, Attachment F requires that FHAP agencies "administer [their] grant[s] in accordance with all applicable immigration restrictions and requirements," including EO 14218, "Ending Taxpayer Subsidization of Open Borders." Guidance Attach. F ¶ 8; *see also* Exec. Order No. 14,218 § 2, 90 Fed. Reg. 10,581 (Feb. 19, 2025) ("Immigration EO").

84.    This administration issued the Immigration EO to "ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens." Immigration EO § 2.

85.     This condition prohibits any "state or unit of general local government that receives funding under this grant" from "using that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." Guidance Attach. F ¶ 8 ("Immigration Condition").

86.     There is no basis in the FHA for this condition, and the Guidance does not provide an explanation for imposing it, nor does it explain how FHAP funding could be used to "facilitate[] the subsidization or promotion of illegal immigration." *Id.* Thus, Plaintiffs have no notice of what conduct is prohibited by the Immigration Condition.

### 5.     Other Courts have Enjoined these Conditions

87.     Numerous courts have already enjoined HUD from imposing identical or nearly identical conditions in other contexts, including: (a) HUD's Continuum of Care ("CoC") program for homelessness prevention, *City of Seattle v. Trump*, No. 25-cv-01435, 2025 WL 3041905, at *13, *33-34 (Oct. 31, 2025) (enjoining grant condition implementing Gender Ideology EO), *appeal filed,* No. 25-8096 (9th Cir. Dec. 29, 2025); *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 886-87, 893-94 (W.D. Wash. 2025) (enjoining HUD from enforcing similar Gender Ideology, Anti-Abortion, and Immigration Conditions), *appeal docketed*, No. 25-3664 (9th Cir. Jun. 10, 2025); (b) grants administered by HUD's Office of Community Planning and Development ("CPD"), *RI Coal. Against Domestic Violence v. Kennedy*, No. 25-cv-342, 2025 WL 2988705, at *12-13, *37-38 (D.R.I., Oct. 23, 2025) (enjoining similar Gender Ideology, Anti-Abortion, and Immigration Conditions in CPD grant programs), *appeal docketed*, No. 25-2229 (1st Cir. Dec. 23, 2025); and (c) Public Housing Program formula grants, grants provided through the Service Coordinators in Multifamily Housing Program, and Family Self-Sufficiency program grants, *Hous. Auth. of Cnty. of S.F. v. Turner*, No. 25-cv-08859, 2025 WL 3187761, at *21, *65-66 (N.D. Cal., Nov. 14, 2025) (enjoining similar Gender Ideology, Anti-Abortion, and Immigration Conditions), *appeal docketed*, No. 26-233 (9th Cir. Jan. 13, 2026).

### III.     DEFENDANTS' OTHER RELATED ATTACKS ON FAIR HOUSING ENFORCEMENT

88.     In addition to their attempted changes to the FHAP, Defendants have taken several other steps to weaken fair housing enforcement nationwide since early 2025.

1    89.    First, HUD has gutted its own fair housing enforcement capabilities.

2    90.    Staffing levels within HUD FHEO have plummeted since the beginning of this

3    administration through reductions in force, reassignments, and mass firings.[5] HUD also fired

4    FHEO employee whistleblowers after they publicly sounded the alarm regarding HUD's

5    decimation of fair housing enforcement.[6]

6    91.    HUD has charged significantly fewer housing discrimination cases than in the past: as

7    of September 2025, HUD had charged only four housing discrimination cases since the beginning

8    of this administration, far fewer than its typical annual average of thirty-five cases.[7]

9    92.    Defendants have also worked to dismantle the FHIP, another decades-old program

10    designed to help enforce the FHA.[8]

11    93.    FHIP provides funding to fair housing organizations and other non-profits that help

12    housing discrimination victims file fair housing complaints, conduct preliminary investigations of

13    housing discrimination claims and fair housing testing, and carry out community outreach and

14    education regarding fair housing laws.[9] In February 2025, HUD abruptly terminated FHIP

15    funding for nearly eighty grantees.[10] HUD only restored the grants at issue in response to a

---

[5] Cassandra Dumay & Katherine Hapgood, *White House Fires Hundreds of HUD Employees in Latest Staff Reduction,* Politico Pro (Oct. 10, 2025), https://subscriber.politicopro.com/article/2025/10/white-house-fires-hundreds-of-hud-employees-in-latest-staff-reduction-00604042 (on file with Office of the Illinois Attorney General); Katherine Hapgood, *HUD Shutdown Plan Reveals Extent of Trump Administration's Reductions*, Politico Pro (Oct. 1, 2025), https://subscriber.politicopro.com/article/2025/10/hud-shutdown-plan-reveals-extent-of-trump-administrations-reductions-00589903 (on file with Office of the Illinois Attorney General); Debra Kamin, *Trump Appointees Roll Back Enforcement of Fair Housing Laws*, N.Y. Times (Sep. 22, 2025), https://www.nytimes.com/2025/09/22/realestate/trump-fair-housing-laws.html (on file with Office of the Illinois Attorney General).
[6] Debra Kamin, *Two HUD Civil Rights Lawyers Dismissed After Raising Concerns about Fair Housing Act Enforcement*, N.Y. Times (Sep. 29, 2025), https://www.nytimes.com/2025/09/29/us/politics/hud-lawyers-whistleblowers.html (on file with Office of the Illinois Attorney General).
[7] Kamin, *supra* note 5.
[8] *See, e.g.,* Press Release, Nat'l Fair Hous. All., Federal Class Action Filed Against HUD for Unconstitutional Withholding of Fair Housing Funds (Jun. 24, 2025), https://nationalfairhousing.org/federal-class-action-filed-against-hud-for-unconstitutional-withholding-of-fair-housing-funds/ (on file with Office of the Illinois Attorney General).
[9] U.S. Dep't of Hous. & Urb. Dev., *Fair Housing Initiatives Program (FHIP)*, https://www.hud.gov/stat/fheo/initiatives-program [https://perma.cc/9S76-XD58] (last visited Feb. 25, 2026).
[10] Jesse Bedayn, *Trump Administration to Slash Funding for Enforcement of Fair Housing Laws*,

(continued…)

21

1   lawsuit. *See* Joint Stipulation for Dismissal 1-2, *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. &*
2   *Urb. Dev.*, No. 25-cv-30041 (D. Mass. Dec. 22, 2025).

3          94.    Taken together, these actions constitute a full-scale attack on fair housing
4   enforcement in the United States. As fair housing enforcement capacity in the United States
5   shrinks, housing discrimination victims will increasingly need to rely on state and local FHAP
6   agencies to vindicate their rights.

7   **IV.    THE GUIDANCE HARMS PLAINTIFFS.**

8          95.    The Challenged Provisions present Plaintiffs with an impossible choice: (1) attempt
9   to comply with Defendants' anemic reimagining of the FHAP and limit the fair housing
10  protections Plaintiffs can offer their residents, or (2) forgo a vital federal partnership and forfeit
11  critical federal funds and case referrals.

12         96.    Neither option is viable. Plaintiff agencies rely on FHAP funds to enforce fair
13  housing laws and vindicate the rights of housing discrimination victims. Yet the Challenged
14  Provisions hamper Plaintiff agencies' ability to enforce the FHA and their own fair housing laws.
15  Defendants may not lawfully force Plaintiffs onto the horns of this dilemma.

16      **A.    The Loss of FHAP Funding Would Harm Plaintiff Agencies.**

17         97.    If Plaintiff agencies are forced to forgo their partnerships with HUD through the
18  FHAP, they will lose critical funding for staffing and investigative capacity. In many cases,
19  Plaintiff agencies that lose FHAP funding will be forced to lay off enforcement staff or to leave
20  open positions vacant, reducing their capacity to investigate and remedy housing discrimination.

21         98.    The financial uncertainty created by the Challenged Provisions of Defendants'
22  Guidance Package has already harmed Plaintiffs' fair housing operations: at least one Plaintiff
23  agency has left positions vacant due to the uncertainty of future HUD funding.

24         99.    Loss of staff across Plaintiff agencies is likely to increase investigator and attorney
25  caseloads, which will lead to complaint backlogs, extended complaint processing timelines,

26

27  _____
    Associated Press (Feb. 28, 2025), https://apnews.com/article/trump-doge-housing-crisis-cuts-
    discrimination-d0c6e3b4b030787a1f60a7dc153153dd (on file with Office of the Illinois Attorney
28  General).

delays in case resolution, and reduction in the quality of investigations. This would exacerbate Plaintiff agencies' pre-existing resource constraints.

100.   The gaps left by funding interruptions to Plaintiff agencies would not be readily filled by other entities. In many states, such as in Vermont, the state FHAP agency is the only entity empowered to enforce fair housing laws. Even where other agencies can enforce fair housing laws, FHAP agencies typically have a unique depth of experience.

101.   In addition, individual representation for discrimination victims is scarce, due to the lack of low-cost private counsel and low capacity of legal services programs that handle fair housing cases, as well as HUD's attempted decimation of the FHIP program. *See supra* ¶¶ 92-93. As a result, housing discrimination victims who file charges with FHAP agencies are generally self-represented. Without FHAP enforcement, these individuals would have to represent themselves in court, making a favorable resolution substantially less likely.

102.   In sum, a loss of FHAP funds would thwart Plaintiff agencies' ability to enforce fair housing laws vigorously and leave housing discrimination unchecked and unremedied.

**B.    Harms from the Change in Fair Housing Enforcement Policy**

103.   Continuing to participate in the FHAP despite Defendants' unlawful Change in Fair Housing Enforcement Policy, however, is also untenable.

104.   To maintain their substantial equivalency certification, Plaintiffs would have to weaken their local fair housing laws by removing the protected classes HUD suddenly disfavors. *See* Transmittal Memo at 1. This is a direct assault on Plaintiffs' ability to enforce their own laws.

105.   For those Plaintiff agencies that continue to enforce laws recognizing broader protected bases than the FHA, the Change in Fair Housing Enforcement Policy will, at a minimum, impose significant administrative burdens, because agencies will be required to process many complaints twice to ensure HUD reimbursement. This will drain Plaintiff agencies' already limited resources and extend complaint processing times. Even after doing so, HUD may still try to rescind Plaintiff agencies' substantial equivalence certifications for enforcing protected classes beyond those in the FHA.

106.  Plaintiff agencies have acted in reliance on HUD's longstanding substantial equivalence and reimbursement policies. Many Plaintiff agencies have enforced laws that include more expansive protections than the FHA and have been certified as substantially equivalent for decades. New Jersey's FHAP agency, for example, was certified substantially equivalent in 2006, yet New Jersey's fair housing law prohibited discrimination based on sexual orientation and lawful source of income for over a decade before then. Since receiving substantial equivalency certification, New Jersey's fair housing law has been expanded to prohibit discrimination based on gender identity and expression (2006), pregnancy (2014), and veteran status (2026).

107.  Connecticut's FHAP agency, CCHRO, has been deemed substantially equivalent for approximately 30 years. That whole time, CCHRO has enforced housing laws that prohibit discrimination based on factors not explicitly covered by the FHA, such as sexual orientation, and added even more protected bases to its state law.

108.  Plaintiff agencies have developed policies, procedures, budgets, and staffing plans in reliance on their substantial equivalency certifications and longstanding HUD policy permitting reimbursement for cases as long as at least one protected basis was cognizable under the FHA. Plaintiff agencies will be harmed by having to alter those procedures and plans due to Defendants' Change in Fair Housing Enforcement Policy.

**C.    Harms Resulting from the Attachment F Conditions**

109.  Complying with the Attachment F Conditions will also significantly harm Plaintiff agencies. First, the vagueness of the Gender Ideology Condition, Anti-Abortion Condition, and Immigration Condition makes it difficult for FHAP agencies to know what conduct HUD considers noncompliant. This difficulty is pronounced in the fair housing enforcement context where FHAP agencies engage in a variety of activities, including complaint investigation, conciliation, enforcement, as well as education and outreach. *See* 24 C.F.R. § 115.300 (describing the activities for which FHAP funding may be used). Plaintiffs are thus at risk of unintentionally violating one or more Conditions and losing their FHAP funding. In addition, the Disparate Impact Condition expressly prohibits Plaintiffs from enforcing their own lawfully enacted fair housing laws.

110.   The exact bounds of the Gender Ideology Condition are ambiguous. There is no explanation or definition, either in the EO or in Attachment F, of what it means to "promote" gender ideology in the context of fair housing enforcement. The term "gender ideology," is not defined in Attachment F and is incompletely defined in the EO. *See* Gender Ideology EO § 2(f).

111.   Plaintiffs cannot know what these terms mean and therefore face a dilemma: do more than may be required to comply with the condition and risk failing in their constitutional and statutory obligations to protect transgender and gender nonconforming residents, or do too little and risk losing federal funding. Either choice would harm Plaintiffs.

112.   The Anti-Abortion Condition is likewise intolerably vague, because it fails to explain or define what it means to "promote" elective abortion. Plaintiffs again run the risk of inadvertently taking actions that put their federal funding at risk, even if their intention is to comply with the Condition. Further, some Plaintiff agencies enforce fair housing laws that prohibit discrimination based on reproductive health decisions, and all Plaintiff agencies enforce the FHA's prohibition against discrimination based on familial status. Plaintiffs are left to guess whether the Anti-Abortion Condition imposes a constraint on their enforcement of those statutory provisions, potentially resulting in less protection against housing discrimination for residents.

113.   The Immigration Condition has the same ambiguity problem. HUD does not explain what it means to "subsidize" or "promote" illegal immigration, or how an agency might use FHAP funding "in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration." Likewise, the Condition does not explain what it means to "abet" policies that seek to shield "illegal aliens" from deportation.

114.   The Disparate Impact Condition also harms Plaintiffs by forcing them to abandon a core enforcement tool used to root out discrimination. Plaintiff agencies have used disparate impact theories to address facially neutral policies that discriminate against individuals protected by their state or local fair housing laws in many different contexts in housing alone. *See, e.g.*, Ill. Dep't of Hum. Rts., *Fair Housing Implications of Nuisance and Crime-Free Ordinances: A Guide for Units of Local Government* 20 (2023), https://dhr.illinois.gov/content/dam/soi/en/web/dhr/ publications/documents/idhr-uic-nuisance-

ordinance-guidebook-2023-01-25.pdf (utilizing disparate impact theories to address nuisance ordinances that penalize domestic violence survivors because they disproportionately impact women); Cal. Code Regs., Tit. 2, §§ 12265, 12266 (utilizing disparate impact provisions of the California Fair Employment and Housing Act to address housing discrimination resulting from the use of criminal history information). In addition, because the Disparate Impact Condition facially prohibits FHAP funding recipients from "issuing findings utilizing disparate impact liability" in all contexts, the Condition could also restrict Plaintiff agencies, like the ones in Illinois and California, that enforce antidiscrimination laws applicable to employment and other fields, from issuing disparate impact findings in contexts other than housing. *See* Guidance Attach. F ¶ 7. Once again, Defendants seek to prevent Plaintiffs from utilizing a tool that is legally available to them under their state laws to address discrimination, in a direct assault on state sovereignty.

## CAUSES OF ACTION

### COUNT I

Violation of the Administrative Procedure Act
Agency Action in Excess of Statutory Authority
(Change in Fair Housing Enforcement Policy)

115.   Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

116.   Defendants include "agenc[ies]" under the Administrative Procedure Act ("APA"). 5 U.S.C. § 551(1).

117.   The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

118.   HUD's Change in Fair Housing Enforcement Policy is reviewable as final agency action under the APA. 5 U.S.C. § 704. The Guidance Package containing this policy change constitutes the consummation of Defendants' decision-making process: it contains no disclaimers casting doubt upon the finality of its provisions and is intended to be "utiliz[ed] in administering

FY2025 FHAP funds" and "for FHEO and FHAP agencies' administration of FHAP program requirements." Transmittal Memo at 1.

119.   Defendants' Change in Fair Housing Enforcement Policy establishes rights and obligations of multiple parties and carries significant legal consequences.

120.   The Change in Fair Housing Enforcement Policy runs contrary to both the statutory text and Congress' intent when it passed the FHA and subsequent amendments, which was to broaden, rather than limit, enforcement of fair housing laws. Congress set forth the criteria to establish substantial equivalence and expressly gave states and localities the ability to enact and enforce their own fair housing laws with protections that exceed federal law. *See* 42 U.S.C. §§ 3610(f)(3)(A); 3615.

121.   Congress did not grant Defendants the discretion to coerce states into limiting the protected classes in their own fair housing laws to those explicitly in the FHA. This exceeds Defendants' authority and directly undermines the expansive purpose of the FHA.

122.   Accordingly, Defendants enacted the Change in Fair Housing Enforcement Policy in excess of statutory authority.

123.   Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Change in Fair Housing Enforcement Policy violates the APA.

124.   Plaintiffs are also entitled to vacatur of the Change in Fair Housing Enforcement Policy pursuant to 5 U.S.C. § 706, a stay of the Policy pursuant to 5 U.S.C. § 705, and a permanent injunction preventing the Policy's implementation.

## COUNT II

Violation of the Administrative Procedure Act
Agency Action Not in Accordance with Law
(Change in Fair Housing Enforcement Policy)

125.   Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

126.   The APA requires that a court set aside agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

127.   An agency must "abide by its own regulations." *Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008). Courts "will not hesitate to overturn agency action" where an agency "fails to comply with its own regulations." *Neumann's Pharmacy, L.L.C. v. Drug Enf't Admin.*, 167 F.4th 320, 327-28 (5th Cir. 2026).

128.   Under HUD's regulations, if a state or local law "is different than the [FHA] in a way that does not diminish coverage of the [FHA], including, but not limited to, the protection of additional prohibited bases, then the state or local law may be found substantially equivalent." 24 C.F.R. § 115.204(h); *see also* 2007 FHAP Funding Regulation, *supra* ¶ 45, at 19071.

129.   Under the Guidance Package, HUD will conduct substantial equivalence reviews in fiscal year 2026, and any FHAP agency enforcing a state or local law that "grant[s] substantive rights not found in the federal Fair Housing Act risk[s] having their substantial equivalency revoked." Transmittal Memo at 2.

130.   This new Policy is in direct conflict with HUD's regulation and longstanding policy that additional protections in a state or local law are not a basis to rescind substantial equivalence certification.

131.   Accordingly, HUD has violated its own regulation in enacting the Change in Fair Housing Enforcement Policy.

132.   Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Change in Fair Housing Enforcement Policy violates the APA.

133.   Plaintiffs are also entitled to vacatur of the Change in Fair Housing Enforcement Policy pursuant to 5 U.S.C. § 706, a stay pursuant to 5 U.S.C. § 705, and a permanent injunction preventing the Policy's implementation.

### COUNT III

Violation of the Administrative Procedure Act
Arbitrary and Capricious Agency Action
(Change in Fair Housing Act Enforcement Policy)

134.   Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

135.   Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *accord FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567-68 (2025).

136.   An agency action is arbitrary or capricious where the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

137.   When an agency "rescinds a prior policy," the agency must, at minimum, "consider the alternatives that are within the ambit of the existing policy," "consider [] important aspect[s] of the problem," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 32-33 (2020) (citations and internal quotation marks omitted).

138.   Defendants' changes to the criteria for finding substantial equivalence and to the reimbursement policy set forth in the Guidance Package are arbitrary and capricious for several reasons, including the following:

  a.   Defendants have reversed decades of agency policy interpreting the Fair Housing Act as the baseline, rather than the upper limit, for fair housing enforcement without explanation, justification, or even acknowledgement of this 180-degree change.

  b.   Defendants have ignored Plaintiffs' reliance on HUD's longstanding practice of (1) granting substantial equivalency to FHAP agencies that enforce local laws protecting classes beyond those in the FHA, and (2) reimbursing FHAP agencies for work on complaints involving both federally protected traits and those protected by state or local fair housing laws. Many state and local agencies have

29

1    been certified as substantially equivalent for decades. They have developed

2    policies, procedures, budgets, and staffing plans in reliance on HUD's

3    longstanding policy and practice. Now, they face the threat of losing critical

4    reimbursement funds and their substantial equivalency certifications.

5    c.  Defendants have failed to consider that their new Policy will make it more

6    difficult for FHAP agencies to vindicate the rights of complainants. FHAP

7    agencies that lose substantial equivalency certification will have limited capacity

8    to process complaints, delaying justice for victims of discrimination. And fewer

9    discrimination victims will be vindicated at all if Plaintiffs must abandon their

10    laws granting greater protection from discrimination in order to maintain

11    substantial equivalency certification.

12    d.  Defendants have also failed to account for the administrative burdens on agencies

13    that may have to process the same complaints twice if they include allegations of

14    discrimination based on both FHA-protected and state-protected traits. This will

15    waste time and resources and will impede fair housing enforcement.

16    139.  Defendants' Change in Fair Housing Enforcement Policy is arbitrary and capricious

17  in violation of 5 U.S.C. § 706.

18    140.  Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a

19  declaration that the Change in Fair Housing Enforcement Policy violates the APA.

20    141.  Plaintiffs are also entitled to vacatur of the Change in Fair Housing Enforcement

21  Policy pursuant to 5 U.S.C. § 706, a stay of the Policy pursuant to 5 U.S.C. § 705, and a

22  permanent injunction preventing the Policy's implementation.

### COUNT IV

Violation of the Administrative Procedure Act
Without Observance of Procedure Required by Law
(Change in Fair Housing Act Enforcement Policy)

27    142.  Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the

28  preceding paragraphs as if fully set forth herein.

1    143.   Under the APA, a "court shall . . . hold unlawful and set aside agency actions,

2   findings, and conclusions found to be . . . without observance of procedure required by law." 5

3   U.S.C. § 706(2)(D).

4    144.   The APA requires that all substantive rules, as well as the amendment or repeal of

5   such rules, be subject to notice and comment rulemaking. 5 U.S.C §§ 553(b)-(c), 551(5) (defining

6   rulemaking to include "formulating, amending, or repealing a rule"); *see also Consumer Energy*

7   *Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982), *aff'd sub nom. Process Gas*

8   *Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983) (noting that the APA

9   "expressly contemplates" that notice and comment rulemaking is required for amending and

10   repealing a rule).

11    145.   A rule is substantive if it "creates rights, assigns duties, or imposes obligations, the

12   basic tenor of which is not already outlined in the law itself." *La Casa Del Convaleciente v.*

13   *Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992).

14    146.   Under HUD's regulations, a substantially equivalent agency is expressly permitted to

15   enforce a state law that provides broader protections than the FHA. *See* 24 C.F.R. § 115.204; *see*

16   *also* 2007 FHAP Funding Regulation, *supra* ¶ 45. This regulation was promulgated after notice

17   and comment under 5 U.S.C § 553(b). The Change in Fair Housing Enforcement Policy turns this

18   regulation on its head, declaring HUD may revoke the certification of agencies that enforce state

19   and local fair housing laws that grant substantive rights not expressly found in the text of the

20   FHA. Because this massive change in HUD policy would repeal a substantive rule, HUD must

21   comply with the notice and comment procedures in the APA. *See Erringer v. Thompson*, 371 F.3d

22   625, 632 (9th Cir. 2004) ("Any rule that effectively amends a prior legislative rule is legislative

23   and must be promulgated under notice and comment rulemaking.").

24    147.   Defendants promulgated this policy change without engaging in notice and comment

25   rulemaking as required by the APA. As such, HUD did so without observance of procedure

26   required by law.

27    148.   Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a

28   declaration that the Change in Fair Housing Enforcement Policy violates the APA.

149.   Plaintiffs are also entitled to vacatur of the Change in Fair Housing Enforcement Policy pursuant to 5 U.S.C. § 706, a stay of the Policy pursuant to 5 U.S.C. § 705, and a permanent injunction preventing the Policy's implementation.

**COUNT V**

Violation of the Administrative Procedure Act
Agency Action in Excess of Statutory Authority
(Anti-Abortion, Disparate Impact, and Immigration Conditions)

150.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

151.   The Guidance Package makes the Anti-Abortion, Disparate Impact, and Immigration Conditions mandatory provisions of all FHAP cooperative agreements for fiscal year 2025. This is final agency action, because it marks the consummation of Defendants' decision-making process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

152.   The Anti-Abortion, Disparate Impact, and Immigration Conditions violate the APA because they are in excess of HUD's statutory authority. *See* 5 U.S.C. § 706(2)(C).

153.   The Disparate Impact Condition runs contrary to both the statutory text and Congress' intent when it passed the FHA and subsequent amendments, which was to broaden, rather than limit, enforcement of fair housing laws. Congress expressly preserved the ability of states and localities to enact and enforce fair housing laws that provide protections that exceed federal law. 42 U.S.C. § 3615. Congress did not grant HUD the discretion to coerce states into limiting the theories of liability created by their own fair housing laws. This exceeds HUD's authority and directly undermines the expansive purpose of the FHA.

154.   The Anti-Abortion and Immigration Conditions exceed HUD's statutory authority for more fundamental reasons: neither the FHA nor any other statute authorizes HUD to impose these conditions, and HUD lacks the authority to require FHAP agencies to agree to them.

155.   The Anti-Abortion and Immigration Conditions have no relationship to the text or purpose of the FHA. And Congress did not grant HUD authority to condition FHAP funds on

vague or irrelevant policy preferences unrelated to the statute's purpose. Thus, HUD lacks the discretion to impose these conditions.

156.   Therefore, in imposing the Anti-Abortion, Disparate Impact, and Immigration Conditions, Defendants exceeded the statutory authority granted to HUD by Congress.

157.   Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Anti-Abortion, Disparate Impact, and Immigration Conditions violate the APA.

158.   Plaintiffs are also entitled to vacatur of the Anti-Abortion, Disparate Impact, and Immigration Conditions pursuant to 5 U.S.C. § 706, a stay of the Conditions pursuant to 5 U.S.C. § 705, and a permanent injunction preventing the implementation of the Conditions.

**COUNT VI**

Violation of the Administrative Procedure Act
Arbitrary and Capricious Agency Action
(Attachment F Conditions)

159.   Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

160.   Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); *see Fox Television Stations*, 556 U.S. at 515; *accord Wages & White Lion Invs., LLC*, 604 U.S. at 567-68.

161.   An agency action is arbitrary or capricious where the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).

162.   When an agency "rescinds a prior policy," the agency must, at minimum, "consider the alternatives that are within the ambit of the existing policy," "consider [] important aspect[s] of the problem," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec.*, 591 U.S. at 30, 32-33 (citations and internal quotation marks omitted).

163.   Defendants' imposition of the Attachment F Conditions is arbitrary and capricious for at least the following reasons:

    a.   Imposition of the Attachment F Conditions is neither reasonable nor reasonably explained with respect to any of the individual conditions.

    b.   Defendants have "failed to consider . . . important aspects of the problem before" them. *Dep't of Homeland Sec.*, 591 U.S. at 25 (citation omitted); *see also State Farm*, 463 U.S. at 43. Defendants failed to consider Congress' intent that HUD and FHAP agencies work collaboratively to promote fair housing. Instead, the Conditions will hinder Plaintiff agencies' ability to do this vital work.

    c.   Defendants fail to acknowledge that the Conditions are an extreme deviation from HUD's previous practice—HUD has never imposed conditions of this sort during the FHAP's almost fifty-year history.

    d.   Defendants blatantly ignore Plaintiffs' reliance interests. Plaintiffs critically rely on FHAP funding—free of the Attachment F Conditions—to enforce their fair housing laws and ensure equal access to housing free of discrimination. Because of their vagueness, the Attachment F Conditions will either significantly encumber FHAP agencies' ability to do this vital work or force them to forgo these funds altogether. Because of their ambiguity, the Attachment F Conditions will dramatically impair fair housing enforcement at a time when housing discrimination remains a pervasive problem and housing discrimination victims have few options to vindicate their rights.

    e.   Defendants attempt to impose the Attachment F Conditions on Plaintiff agencies in furtherance of policies set forth in various Executive Orders, regardless of whether those policies are part of, or consistent with, the goals of the FHA. In so doing, Defendants consider factors Congress did not intend them to consider and violate the APA.

164.   For all these reasons, Defendants have acted arbitrarily and capriciously in imposing the Attachment F Conditions.

165.  Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Attachment F Conditions violate the APA.

166.  Plaintiffs are also entitled to vacatur of the Attachment F Conditions pursuant to 5 U.S.C. § 706, a stay of the Conditions pursuant to 5 U.S.C. § 705, and a permanent injunction preventing the implementation of the Conditions.

### COUNT VII

Violation of the U.S. Constitution
Spending Clause
(Gender Ideology, Anti-Abortion, and Immigration Conditions)

167.  Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

168.  Under the Spending Clause, conditions on a state's acceptance of federal funds "must be set out 'unambiguously.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). The requirement of clarity ensures that a "State [can] make an informed choice" whether to accept the funding. *Pennhurst*, 451 U.S. at 25. In addition, the Spending Clause prohibits conditions on federal funding that are wholly unrelated to the purpose of the programs. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

169.  The Gender Ideology, Anti-Abortion and Immigration Conditions violate the Spending Clause because they are ambiguous.

170.  The Gender Ideology Condition is unreasonably vague. The definition of "gender ideology" set forth in the Gender Ideology EO and incorporated into the Gender Ideology Condition is highly imprecise. The definition explicitly contemplates "an ever-shifting concept of self-assessed gender identity." Gender Ideology EO § 2(f). As defined by the EO, therefore, "gender ideology" is inherently imprecise, and the Condition cannot provide the clarity required under the Spending Clause.

35

171.   Further, there is no explanation of what conduct would constitute "promot[ing]" this "ideology," in the context of enforcing the FHA, leaving FHAP agencies to guess what is required of them.

172.   The Anti-Abortion Condition is likewise vague. Like the Gender Ideology Condition, the Anti-Abortion Condition contains no explanation of what it means to "promote" elective abortion or what conduct would violate the Condition in the fair housing context.

173.   The Immigration Condition is ambiguous because it, too, is rife with vague, undefined terms. HUD does not explain what it means to "subsidize" or "promote" illegal immigration, let alone what it means to "facilitate" the subsidization or promotion of illegal immigration. Nor is it clear what it means for a FHAP agency to "abet" policies that seek to shield "illegal aliens" from deportation.

174.   In addition, the Gender Ideology, Anti-Abortion, and Immigration Conditions violate the Spending Clause because at least some of them are not related to the purpose of the FHA, which is to provide, "within constitutional limits, for fair housing throughout the United States." 42 U.S.C. § 3601.

175.   The Conditions are also not related to the purpose of the FHAP, which is to build a "coordinated intergovernmental enforcement effort to further fair housing." 24 C.F.R. § 115.300.

176.   For at least these reasons, the Gender Ideology, Anti-Abortion, and Immigration Conditions violate the Spending Clause, because they are impermissibly vague, ambiguous, and not reasonably related to the purpose of the federal spending program.

177.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Gender Ideology, Anti-Abortion, and Immigration Conditions violate the Spending Clause, and a permanent injunction preventing the implementation of the Gender Ideology, Anti-Abortion, and Immigration Conditions.

**COUNT VIII**

Violation of the Administrative Procedure Act
Agency Action Contrary to Constitutional Right
(Gender Ideology, Anti-Abortion, and Immigration Conditions)

178.  Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

179.  The APA requires courts to "hold unlawful and set aside" agency actions that are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

180.  As laid out above, the Gender Ideology, Anti-Abortion, and Immigration Conditions violate the Spending Clause of the U.S. Constitution. Because they do, this Court must also set aside the Conditions under the APA as contrary to constitutional right.

181.  Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Gender Ideology, Anti-Abortion, and Immigration Conditions violate the APA.

182.  Plaintiffs are also entitled to vacatur of the Gender Ideology, Anti-Abortion, and Immigration Conditions pursuant to 5 U.S.C. § 706, a stay of the Conditions pursuant to 5 U.S.C. § 705, and a permanent injunction preventing the implementation of the Conditions.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment against Defendants and award the following relief:

1.    Pursuant to 5 U.S.C. § 705, grant a stay of the Change in Fair Housing Act Enforcement Policy, the Attachment F Conditions, and any actions taken by Defendants to implement or enforce them;

2.    Declare, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, that Defendants lack authority to impose the Change in Fair Housing Act Enforcement Policy and Anti-Abortion, Disparate Impact, and Immigration Conditions;

1    3.    Declare that the adoption of the Change in Fair Housing Act Enforcement Policy, the

2        Attachment F Conditions, and any actions taken by HUD to implement or enforce

3        them violate the Administrative Procedure Act;

4    4.    Vacate Defendants' adoption of the Change in Fair Housing Act Enforcement Policy,

5        the Attachment F Conditions, and any actions taken by Defendants to implement or

6        enforce them;

7    5.    Permanently enjoin Defendants from implementing or enforcing the Change in Fair

8        Housing Act Enforcement Policy and Attachment F Conditions against Plaintiffs,

9        including their subdivisions and instrumentalities;

10    6.    Award Plaintiffs their costs and reasonable attorney's fees; and

11    7.    Award such additional relief as the interests of justice may require.

12    Dated: March 16, 2026                    Respectfully submitted,

13

14    **KWAME RAOUL**                    **ROB BONTA**
Attorney General of Illinois            Attorney General of California
15                                MICHAEL L. NEWMAN
                                Senior Assistant Attorney General
16    */s/ Paul Berks*                    JOEL MARRERO
CARA HENDRICKSON*                    Supervising Deputy Attorney General
17    Executive Deputy Attorney General        HEIDI JOYA
PAUL BERKS*                        LAUREN GREENAWALT
18    Complex Litigation Counsel            JONATHAN BENNER
GRETCHEN HELFRICH*                    ALEX FLORES
19    Deputy Chief, Special Litigation Bureau
KATHERINE PANNELLA*
20    Senior Assistant Attorney General        */s/ Jarrell E. Mitchell*
ELIZABETH H. JORDAN*                JARRELL E. MITCHELL
21    Senior Social Equity Counsel            Deputy Attorneys General
MARY ROSENBERG*                    *Attorneys for Plaintiff State of California*
22    Assistant Attorney General
Office of the Illinois Attorney General
23    115 S. LaSalle St., Chicago, IL 60603
(773) 919-2923
24    Paul.Berks@ilag.gov
Cara.Hendrickson@ilag.gov
25    Gretchen.Helfrich@ilag.gov
Katherine.Pannella@ilag.gov
26    Elizabeth.Jordan@ilag.gov
Mary.Rosenberg@ilag.gov
27    *Attorneys for Plaintiff State of Illinois*

28

**BRIAN L. SCHWALB**
Attorney General of the District of Columbia

/s/ Nicole S. Hill
ELIZA H. SIMON
Senior Counsel to the Attorney General
NICOLE S. HILL*
Assistant Attorney General
Office of the Attorney General
of the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 727-4171
Nicole.Hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

**KRISTIN K. MAYES**
Attorney General of the State of Arizona

/s/ Syreeta A. Tyrell
HAYLEIGH S. CRAWFORD*
Deputy Solicitor General
Syreeta A. Tyrell*
Senior Litigation Counsel
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
Syreeta.Tyrell@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

**PHILIP J. WEISER**
Attorney General of Colorado

/s/ Kristopher Brambila
KRISTOPHER BRAMBILA*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
kristopher.brambila@coag.gov
*Attorneys for Plaintiff State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

/s/ Laura Thurston
LAURA THURSTON*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Laura.Thurston@ct.gov
*Attorneys for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

/s/ Ian R. Liston
IAN R. LISTON*
Director of Impact Litigation
ROSE E. GIBSON
VANESSA L. KASSAB
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

/s/ Kaliko'onālani D. Fernandes
DAVID D. DAY*
Special Assistant to the Attorney General
KALIKO'ONĀLANI D. FERNANDES*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawai'i*

Complaint for Declaratory and Injunctive Relief

**AARON M. FREY**
Attorney General of Maine


/s/ Katherine W. Thompson
KATHERINE W. THOMPSON*
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov
Attorneys for Plaintiff State of Maine

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts


/s/ Nita K. Klunder
NITA K. KLUNDER (BBO No. 689304)*
State Trial Counsel
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2394
nita.klunder@mass.gov
Attorneys for Plaintiff Commonwealth of
Massachusetts

**ANTHONY G. BROWN**
Attorney General of Maryland


/s/ Yasmin Dagne
YASMIN DAGNE*
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-223-1580
ydagne@oag.maryland.gov
Attorneys for Plaintiff State of Maryland

**DANA NESSEL**
Attorney General of Michigan


/s/ Neil Giovanatti
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30212
Lansing, MI 48909
(517) 335-7622
GiovanattiN@michigan.gov
Attorney for Plaintiff State of Michigan

**JENNIFER DAVENPORT**
Attorney General of New Jersey


/s/ Farng-Yi D. Foo
FARNG-YI D. FOO*
MICHELLE KOSTYACK*
Deputy Attorneys General
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5365
Farng-Yi.Foo@law.njoag.gov
Michelle.Kostyack@law.njoag.gov
Attorneys for Plaintiff State of New Jersey

**PETER F. NERONHA**
Attorney General for the State of Rhode Island


/s/ Kyla Duffy
KYLA DUFFY (RI Bar No. 10897)*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
kduffy@riag.ri.gov
Attorneys for Plaintiff State of Rhode Island

Complaint for Declaratory and Injunctive Relief

1    **CHARITY R. CLARK**                          **NICHOLAS W. BROWN**
     Attorney General of Vermont                  Attorney General of Washington
2

3    */s/ Julio A. Thompson*                       */s/ Daniel J. Jeon*
     JONATHAN T. ROSE                             DANIEL J. JEON*
4    Solicitor General                            Assistant Attorney General
     JULIO A. THOMPSON*                           Civil Rights Division
5      Co-Director, Civil Rights Unit             800 Fifth Avenue, Suite 2000
     109 State Street                             Seattle, WA 98104-3188
6    Montpelier, VT 06509                         206-464-7744
     (802) 828-3171                               Daniel.jeon@atg.wa.gov
7    Julio.thompson@vermont.gov                   *Attorneys for Plaintiff State of Washington*
     *Attorneys for Plaintiff State of Vermont*
8
       * *pro hac vice forthcoming*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief

Exhibit A

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-2000

OFFICE OF FAIR HOUSING
AND EQUAL OPPORTUNITY

MEMORANDUM FOR: Fair Housing Assistance Program Agency Directors

FROM: Nathan S. Roth, Acting Director, Office of Programs, FHEO

SUBJECT: Transmittal Memo: FY2025 Guidance Package for the
Fair Housing Assistance Program

This memorandum transmits the FY2025 Fair Housing Assistance Program (FHAP) Funding Guidance Package (Guidance). The Guidance consists of the following documents:

1. FY2025 FHAP Funding Guidance
   - Attachment A – *Criteria for Processing*
   - Attachment B – *Standards for Timeliness*
   - Attachment C – *FY2025 Payment Amounts for FHAP Case Processing*
   - Attachment D – *Using HUD Systems*
   - Attachment E – *FY2025 Partnership and Special Enforcement Effort Funds*
   - Attachment F – *Mandatory HUD Grant Agreement Provisions*

The Guidance and the accompanying materials contained herein are for utilization in administering FY2025 FHAP funds and provide instruction and technical guidance for FHEO and FHAP agencies' administration of FHAP program requirements. Any questions regarding the enclosed Guidance should be directed to the appropriate FHEO Region Director and GTR/GTM official. HUD regional staff will consult with the FHEO FHAP Division in HUD Headquarters as necessary to provide technical assistance concerning this Guidance.

In FY2025, the FHAP Division is increasing case processing reimbursement rates and administrative cost rates. The FHAP Division is decreasing training funds available to agencies while increasing the amount of special enforcement funds and partnership funds available to agencies.

FHAP agencies should place special emphasis on the following:

1. Substantial Equivalency Review

   FHAP agencies should only submit cases for reimbursement that have clear, primary basis in a prohibited characteristic that is covered by the plain language of the federal Fair Housing Act. For example, the Fair Housing Act prohibits discrimination based only on the following specifically protected characteristics: race, color, national origin, religion, sex, familial status, and disability. The Fair Housing Act does not include protections for sexual orientation, gender identity, and gender expression; "source of income"; criminal records; weight and height; or limited English proficiency. Any

submitted complaints based on rights not expressly found in the federal Fair Housing Act and other relevant federal civil rights law will not be reimbursed.

24 CFR Part 115, Subpart B, implements section 810(f) of the Fair Housing Act, including the basis and procedures by which a determination is made to grant interim certification and certification to state or local agencies that enforce fair housing laws. Substantial equivalency certification is granted if the Department determines that a state or local agency enforces a law that is substantially equivalent to the federal Fair Housing Act with regard to substantive rights, procedures, remedies, and the availability of judicial review.

As part of this process, the Assistant Secretary for FHEO will determine whether, on its face, the fair housing law that the agency administers provides rights, procedures, remedies, and the availability of judicial review that are substantially equivalent to those provided in the federal Fair Housing Act.

If the Assistant Secretary determines, after application of criteria set forth in §§ 115.204, 115.206, that the state or local law, both "on its face" and "in operation," provides substantive rights, procedures, remedies, and judicial review procedures for alleged discriminatory housing practices that are substantially equivalent to those provided in the federal Fair Housing Act, the Assistant Secretary may enter into a Memorandum of Understanding (MOU) with the agency.

In FY2026, FHEO will review FHAP agency agreements and operations to ensure adequacy of law, and adequacy of performance. As part of FHEO's review, it will seek to ensure that all FHAP efforts are consistent with the federal Fair Housing Act. Local fair housing laws that grant substantive rights outside the seven protected traits found in the federal Fair Housing Act (race, color, national origin, religion, sex, disability, and familial status) may be found not substantially equivalent to federal law. Non-compliant substantive rights include but are not limited to sexual orientation and gender identity or expression, language, criminal records, and source of income. FHAPs governed by local fair housing laws that grant substantive rights not found in the federal Fair Housing Act risk having their substantial equivalency certification revoked.

2. <u>Compliance with Federal Executive Orders</u>

All grantees agree to follow all applicable conditions in compliance with federal executive orders.

3. <u>Timeliness & Enforcement of Cause Findings</u>

The Department is concerned about the timeliness of FHAP agencies processing complaints. Consequently, it is now expected that FHAP agencies will close or charge no fewer than 75% of fair housing complaints filed during the case processing period within 100 days. This increases from 50% in FY2024. Further, FHAP agencies are reminded that their role in the program comprehends <u>both</u> investigations and enforcement. FHAP

agencies that rely on outside enforcement entities (*e.g.*, city/county attorney, state Attorney General) must establish robust and effective relationships with those entities to ensure full enforcement of substantially equivalent laws.

4. <u>Data Input in HEMS</u>

The Department continues to be concerned with the low level of compliance with the requirement to record complete information in HUD Enforcement Management System (HEMS). The requirement to use HEMS and to input complaint information — throughout the entire lifecycle of a complaint — is memorialized in several places, including the program regulations, agency performance standards, the Contributions Agreement, and amplifying HEMS guidance issued in 2016.

Specifically, FHAP agencies must "use HEMS, and must input all relevant data and information into the system in a timely manner." Required information includes investigative information and "all final status information" relating to post-cause enforcement. Information in HEMS allows the Department to track and measure our achievements, identify challenges, and manage our inventory with fewer resources. This information is critical for assessing the performance of individual agencies and the overall operation of the Program. Additional specific guidance on the requirements related to HEMS will be forthcoming.

Finally, important notes about FY2025 Complaint Processing and Performance Periods:

- FY2025 Complaint Processing Period:  July 1, 2024 – June 30, 2025

    *** Only cases submitted to and approved for payment by HUD <u>on or before July 31, 2025,</u> will be processed for payment under this FY2025 Guidance.

- FY2024 Performance Period: October 1, 2024 – September 30, 2025

**Important Note:** For FY2025, HUD has aligned all Periods of Performance to begin October 1, 2025 – September 30, 2026. The purpose is to ensure consistency and to ensure that FHAP agencies have sufficient time to utilize administrative funds and training funds. Consequently, HUD-1044s will reflect this change, which is correct and in line with HUD's new procedure.

Attachments

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC  20410-2000

OFFICE OF FAIR HOUSING
AND EQUAL OPPORTUNITY

## FY2025 Fair Housing Assistance Program (FHAP) Funding Guidance

This document, and its attachments, provide the FY2025 Funding Guidance for both Fair Housing Assistance Program (FHAP) Capacity Building and Contributions agencies. The Guidance contains important details regarding HUD's methodology for determining FHAP agency payments and use of FY2025 funds. This Guidance addresses: 1) training and other matters applicable to all FHAP agencies, 2) funding for Capacity Building agencies, and 3) funding for Contributions agencies.

\*\*\*NOTE: All FHAP funds discussed in this FY2025 FHAP Guidance, and the methodologies for distributing such funds, are subject to the FHAP congressional appropriation, national FHAP complaint processing volume, addition of new participating jurisdictions, and any other factors that necessarily impact the way HUD disburses FHAP funds.

\*\*\*NOTE: FHAP agencies are required to adhere to all federal laws, regulations, and Executive Orders related to the administration of the FHAP. Federal funds utilized for the FHAP program administration must comport with all such laws, regulations, and Executive Orders for the duration of the agreement.

## I. General Requirements and Information for All FHAP Agencies

A. FY2025 Complaint Processing and Performance Periods

Generally, FHAP agencies receive funding based on activities conducted within the preceding twelve-month period (the Performance Period). For purposes of calculating payments for case processing, FHEO uses a Complaint Processing Period which closes a quarter earlier than the Performance Period to allow for the completion of case reviews, payments calculations, and cooperative agreement preparation.

The FY2025 Complaint Processing and Performance Periods are as follows:

- FY2025 Complaint Processing Period:  July 1, 2024 – June 30, 2025

  \*\*\* Only cases submitted to and approved for payment by HUD on or before July 31, 2025, will be processed for payment under this FY2025 Guidance.

- FY2024 Performance Period: October 1, 2024 – September 30, 2025

\*\*\*NOTE: For FY2025, HUD has aligned all Periods of Performance to begin October 1, 2025 – September 30, 2026. The purpose is to ensure consistency and to ensure that FHAP agencies have sufficient time to utilize administrative funds and training funds. Consequently, HUD-1044s will reflect this change, which is correct and in line with HUD's new procedure.

B. Training Funds

Consistent with 24 C.F.R. § 115.306, all (*i.e.*, interim certified and certified) FHAP agencies are eligible to receive training funds to cover costs for HUD-approved or HUD-sponsored training, including travel for such training. Under the regulation, all staff of the agency responsible for the administration and enforcement of the fair housing law must participate in HUD-approved or HUD-sponsored training each year.

All agencies, including Capacity Building agencies, are eligible to receive training funds. The FY2025 Guidance to the FHAP agencies encourages them to provide training not only to their investigative staff, but also to their commissioners or other hearing officers and to their legal staff (where applicable). Additionally, the FY2025 Guidance encourages FHAP agencies to both seek additional educational opportunities for their staff and to request additional training funds when appropriate educational opportunities are identified.

For FY2025, State FHAP agencies will receive $5,000 and Local FHAP agencies will receive $2,500. This marks a sizable change to training funds distribution from $3,000 per FTE allocation to a flat rate model. FHAPs must expend training dollars obligated from prior funding years before expending FY25 training funds. The National Fair Housing Training Academy (NFHTA) will continue to provide tuition-free programs and training for FHAP agencies. However, travel costs related to attending NFHTA courses or for the proposed FHAP convening, and all trainings related to an agency's participation in FHAP—including transportation, lodging, and *per diem*—should be paid with FHAP Training funds. The FY2025 Guidance reminds agencies of the availability of Training funds and the requirement to obtain advance authorization for use of the funds from the respective FHAP GTR / Region Director.

> ***NOTE***:  The FHAP Division strongly encourages the vigorous pursuit of continuing education. Consistent with the memorandum of July 28, 2015 ("*Use of FHAP Training Funds*"), FHAP agencies should seek out other formalized training opportunities for their staff that will enhance their ability to conduct thorough and professional complaint processing. Aside from HUD-sponsored training, such additional opportunities may be offered by, for example, academic institutions, advocacy organizations, professional for-profit training entities, bar associations, or conferences or trainings organized by other FHAP agencies. In support of that pursuit, HUD will only approve use of training funds for education and engagements that align with the Administration's priorities. Additionally, this year the Division has decreased training funds to increase the utilization of prior year funding in training accounts. The Division is suggesting that agencies work with their GTMs and GTRs to determine what older funds are available to each agency.

The FHAP Division may have additional funds that can be used for training. Where appropriate educational opportunities are identified that require additional training funds, a request for such funds should be made to the FHAP Division.

C. Recordkeeping on Race and Ethnicity

Changes were made to the 2000 Census to reflect the growing racial and ethnic diversity of the U.S. population. As a result, Office of Management and Budget (OMB) revised its standards related to federal data on racial and ethnic categories. In collecting racial and ethnic

2

data, FHAP agencies should use the five racial categories, and two ethnic categories outlined below.[1]

Five Racial Categories

1. <u>American Indian or Alaska Native</u>. A person having origins in any of the original peoples of North and South American (including Central America), and who maintains tribal affiliation or community attachment.
2. <u>Asian</u>. A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Island, Thailand, and Vietnam.
3. <u>Black or African American</u>. A person having origins in any of the black racial groups of Africa.
4. <u>Native Hawaiian or other Pacific Islander</u>. A person having origins in any of the original peoples of Hawaii, Guam, Samoa or other Pacific Islands.
5. <u>White</u>. A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

Two Ethnic Categories

1. <u>Hispanic or Latino</u>. A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.
2. <u>Not Hispanic or Latino</u>. A person not of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.

D. <u>Management Goals</u>

In addition to existing FHAP performance standards and requirements enumerated at 24 C.F.R. part 115, FHEO will monitor two management measures in assessing the performance of FHAP agencies. Monitoring these measures, in addition to reviewing closed cases submitted for payment, provides a comprehensive perspective of a FHAP agency's overall case processing, as these measures take into account the management of the agency's open case inventory. FHEO may consider an agency's success under these two measures in prioritizing the distribution of Partnership Funds and Special Enforcement Effort (SEE) funds, if funds are available, or in other ways, to provide incentive for high performance in FHAP agency operations. FHAP agencies may consult with their GTR/GTM to receive intermittent reports to monitor agency progress:

➢ FHAP agencies will close or charge 75% of fair housing complaints filed during the case processing period within 100 days.

➢ FHAP agencies will close or charge 95% of aged fair housing complaints carried over from the prior case processing period.

---

[1] The Census Bureau is preparing to implement OMB's updated 2024 race and ethnicity standards in the 2027 American Community Survey and the 2030 Census and are developing an action plan for how to implement the updated standards in all of agency surveys and data programs that include data on race/ethnicity. For more information regarding implementation visit: https://www.census.gov/about/our-research/race-ethnicity/standards-updates.html.

## II. FHAP Capacity Building Agencies – Interim Certified

Capacity Building (CB) agencies administer a state or local law that has been certified on an interim basis as substantially equivalent to the federal law, on its face. CB agencies enter into an Interim Agreement for a three-year period. During this period, the agency develops and demonstrates its capacity to administer the jurisdiction's substantially equivalent law in accordance with the requirements of the program. CB agencies are provided funds in a fixed annual amount through Cooperative Agreements that are executed <u>each year</u> of interim certification. CB funds must be used to support activities to increase awareness of the law within the jurisdiction, and to administer and enforce the law. In accordance with 24 C.F.R. § 115.302, HUD sets this fixed amount but may provide additional funds during the first year if necessary due to the number of complaints processed. HUD also has the discretion to provide contributions funding to a CB agency. At the conclusion of the three-year period, if the CB agency's performance is satisfactory and its law remains substantially equivalent HUD may transition the agency from interim certified to fully certified (*i.e.*, from a Capacity Building agency to a Contributions agency). This is accomplished by the execution of a *Memorandum of Understanding* between HUD and the agency.

For FY2025, there is an increase to the HUD fixed annual amount for CB agencies up to $200,000. Based on a mix of factors in each jurisdiction, including but not limited to such factors as population, labor costs, and other economic and administrative cost factors, HUD may choose to increase or decrease the fixed annual amount. Like all FHAP agencies, CB agencies must ensure staff are trained in accordance with program requirements. Training and technical assistance should be sought through the NFHTA.

## III. FHAP Contributions Agencies - Certified

FHAP Contributions agencies are provided funds under annually executed Cooperative Agreements. In addition to Training funds (*see* Section 1(B)), contributions agencies are eligible to receive administrative cost and complaint processing funds to support the enforcement of their state or local fair housing law that HUD has certified as substantially equivalent to the federal Fair Housing Act. Subject to budgetary constraints and at HUD's discretion, agencies eligible to receive contributions funds may also qualify for Partnership and SEE funds. The following section of this memorandum presents HUD's FY2025 funding methodology in these areas.

### A. Complaint Processing (CP) Funds

i.  <u>Payment Amounts</u>

In FY2025, there is a slight increase in the full payment for accepted cause and no-cause complaint investigations, which will be $3,600. Payment for conciliation agreements, *i.e.*, conciliation agreements that contain relief for the complainant(s) <u>and</u> effective public interest relief, will be $3,400. The payment for conciliation agreements recognizes the value of obtaining outcomes that are satisfactory to all parties and address meaningful relief in the public interest, often in the form of changes to policies or practices that will have a remedial effect beyond the immediate complainant(s). It is also intended to compensate the agency for required monitoring to ensure implementation of and adherence to conciliation terms.

In an effort to decrease the overall number of administrative closures and more effectively utilize case processing funds, all such closures, as well as "withdrawals with resolution," will continue to be paid at a lower rate of $1,600. An excess of closures for lack of jurisdiction, for example, may be indicative of incomplete interviews or errors at intake. Large numbers of closures due to failure to identify or locate a party may indicate that the agency's efforts at identification or location of parties are insufficient or that lengthy gaps in case processing are resulting in lost contact with parties.

Case closures due to withdrawal with resolution:1) do not typically assure the provision of adequate relief under the law, including relief in the public interest, 2) are not subject to monitoring to ensure adherence to terms, and 3) are not enforceable by the jurisdiction in the event of a breach. The Department recognizes that complaint withdrawals with resolution do not demand agency resources in the same manner as a successful conciliation agreement and therefore will not pay these closures commensurate with fully investigated or conciliated cases. FHAP agencies should not attempt to encourage or persuade a complainant to withdraw a complaint and should not rely on a complainant's withdrawal with resolution as an alternative to the pursuit of a conciliation agreement or an administrative or judicial remedy.

While HUD continues to provide increased monetary resources to FHAP agencies, FHAPs must be aware that Region Directors may exercise their discretion to require FHAP agencies to take on increasing responsibilities with respect to complaint intake. *See*, Section V of the *Memorandum of Understanding* between HUD and each FHAP agency ("In order to protect housing rights and facilitate the filing of complaints, HUD and the Agency each authorize the other to receive complaints for it.").

The distribution of complaint processing funds is addressed at 24 C.F.R. § 115.304(b). For the case processing period concluding June 30, 2025, FHEO will pay Contributions Agencies for processed complaints that are both 1) cognizable under the federal Fair Housing Act, and 2) acceptable for payment under the *Criteria for Processing* and *Standards for Timeliness* included as part of this Guidance (see: Attachments A and B). Under the payment methodology, complaint processing funds are determined by case closure disposition in accordance with the *Case Processing Payment Schedule* on page 6.

For FY2025, the FHAP Division will continue to provide a post-cause enforcement supplemental payment as follows: $5,000 for conducting a post-cause administrative hearing and $8,000 for the filing of a post-cause civil action. Conciliation agreements reached after a cause finding will not qualify as an enforcement action for purposes of this supplemental payment but will be paid as any other case closed with a conciliation agreement.

Many FHAP agencies rely on a separate entity within the jurisdiction's governmental structure for judicial enforcement. In recognition of the fact that challenging fiscal environments can create tension between FHAP agencies and their legal enforcement agencies, in terms of the costs associated with judicial enforcement, the post-cause supplemental payment is intended to facilitate more effective enforcement partnerships within jurisdiction governments. We continue to strongly encourage FHAP agencies to develop interagency agreements for coordination, cause case development and the sharing of enforcement-related costs – all of which contribute to the goal of increased quality enforcement actions to combat unlawful discrimination.

Where the triggering event (*i.e.*, conduct of administrative hearing or filing of civil action)

for the supplemental payment does not occur, an agreement reached after a cause finding will not qualify as an enforcement action for purposes of this supplemental payment. Such cases will be paid as any other cause case unless the disposition is a conciliation agreement (*i.e.*, an agreement signed by the parties <u>and</u> the FHAP agency), in which case it will be paid as any other case closed with a conciliation agreement. Where the triggering event has occurred, a FHAP agency will receive supplemental payment even where the case is resolved by a subsequent agreement, *e.g.*, through a consent decree.

<u>Agencies will receive this increased supplemental payment when the agency has engaged in post-cause enforcement actions and has documented its actions in HEMS.</u> This documentation must occur for the GTR/GTM to authorize payment. This one-time payment will be allowed in cases where the qualifying enforcement action takes place during the 2025 Case Processing Period (defined above), even if the cause determination / charge was issued during an earlier Case Processing Period.

<u>HUD will continue to administer the FHAP program in a fiscally sound manner. HUD will monitor the actual effect of the payment rates and, if necessary, may make subsequent adjustments to complaint processing payments or any other FHAP funding methodologies.</u>

**\*\*\*NOTE: For purposes of budget estimation for the following year it is critical that FHAP agencies communicate accurate information with respect to post-cause enforcement actions to their assigned GTMs/GTRs (and into HEMS) throughout the Performance Period, *i.e.*, # of administrative hearings conducted and # of civil actions filed.**

**FY2024 Case Processing Payment Schedule**

| Case Disposition | FY25 Payment Amount |
|---|---|
| Full Investigation Cause/No Cause | $3,600 |
| Conciliation | $3,400 |
| Administrative Closures | $1,600 |
| Withdrawal with Resolution | $1,600 |
| Post-Cause Enforcement Payment | $5,000 (*administrative hearing held*) $8,000 (c*ivil action filed*) |

ii.  <u>No Quality or Timeliness Deductions from Payment Amounts</u>

FHAP cases accepted for payment will be paid at their full rate, *i.e.*, no deductions will be made from the full payment. This practice provides a more reliable, predictable payment schedule to facilitate the agencies' budget planning and promotes greater consistency in case assessments and case payment rates across regional offices and GTR/GTM staff. It is also intended to provide substantive coordination with FHAP agencies focused on improved quality complaint processing outcomes through routine performance monitoring and feedback, rather than relying on the former practice of case-by-case payment deductions as a method of quality control.

**\*\*\*NOTE**:  While cases accepted for payment will be paid at the full rate, FHAP agencies

6

are reminded that HUD GTRs and Region Directors are vested with discretion and authority to refuse to accept cases for payment where quality and timeliness standards are not met, including the criteria for adequacy of conciliations/settlements set forth in Section V of the *Criteria for Processing*.

FHAP agency management and staff are reminded that the *Criteria for Processing* and the *Standards for Timeliness* (Attachments A and B to this Guidance) remain a valuable FHAP performance monitoring tool and an important part of this FY25 Guidance. GTMs and GTRs will continue to use the criteria and standards to assess the quality of a FHAP agency's complaint processing in connection with both decisions whether to accept cases for payment and Performance Assessment Reports (PARs). PARs, in concert with ongoing monitoring and complaint review and contemporaneous feedback to FHAP agencies, are the proper vehicle for identifying performance concerns and for specifying required corrective actions. Agencies that fail to adequately provide for quality and timeliness in complaint processing may be subjected to performance improvement actions or suspensions without regard to case payment rates.

Finally, FHEO and FHAP agencies must take precautions to ensure that complaint filings and associated case payments are not redundant and duplicative. FHAP agencies should note that FHEO will pay for complaints filed and processed in accordance with intake protocols outlined in the FY2025 Criteria for Processing and Intake Training and protocols provided through NFHTA. Case payments will be made only for unique complaints involving separate and distinct discriminatory actions. Where allegations may be made against two or more respondents, a separate complaint should be filed against each individual respondent only if that respondent's actions constitute a separate violation of the Act. Furthermore, if complainants are married and both are aggrieved persons, a single, joint complaint should be filed. If there are children under age 18 who reside in the household who may have been injured by the alleged discriminatory housing practice(s), they should be listed as "Other Aggrieved Persons" on that same complaint.

### B. Administrative Cost (AC) Funds

As in prior years, AC funds are tied to the quantity of a Contributions agency's caseload. For FY2025, the FHAP Division is increasing the AC fund award schedule. HUD will continue to provide enhanced AC funds to FHAP agencies operating in high-cost areas. The enhancement will be provided by applying a locality adjustment developed by HUD's Office of Policy Development and Research to the FHAP agency's base award. The locality adjustment recognizes and is intended to ameliorate the fact that some FHAP agencies operate in areas with higher labor costs and other economic and administrative cost factors. For FY2025, we will continue to apply only those locality adjustments that result in an increase in AC funding. The FHAP Division will monitor the effects of this change, and refinements may be made in subsequent years.

For FY2025, FHAP agencies that acceptably process 100 or more complaints during the Complaint Processing Period will receive 20% of the agency's total FHAP obligation for FY2024, with a locality adjustment where applicable. For purposes of this calculation, "total FHAP obligation" will not include any Partnership funds or SEE funds the agency may have received in FY2024. Agencies that process fewer than 100 complaints during the Complaint Processing Period will receive AC funds as follows:

**FY2025 Administrative Costs Funds Distribution**

| # of Complaints Acceptably Processed in Complaint Processing Period | FY2025 AC Funds (subject to locality adjustment) |
|---|---|
| 0 – 12 | $9,500 |
| 13 – 30 | $15,500 |
| 31 – 60 | $34,000 |
| 61 – 99 | $62,000 |

AC funds may be used for data and information systems, salaries, and other administrative expenses associated with the administration and enforcement of a substantially equivalent fair housing law. HUD encourages the use of these funds to facilitate the hiring of staff. Agencies must submit a written plan detailing how they intend to use AC funds to the GTR/GTM for approval.

### C. Partnership Funds

For FY2025, the Department is allocating a total of up to $600,000 available for Partnership funds to utilize the services of individuals and/or public, private, for-profit, or not-for-profit organizations. Distribution of these funds will not be made on a formula basis, and decisions on requests for funds from FHAP agencies will be made in headquarters on a case-by-case basis. The priority use of FY2025 Partnership funds is to engage in fair housing education and outreach. Eligibility, use, and control of 2025 Partnership funds is detailed at Attachment E.

### D. Special Enforcement Effort (SEE) Funds

For FY2025, up to $600,000 in SEE funds are available for agencies to supplement enforcement related costs associated with complex or protracted litigation, cover extraordinary enforcement and investigation related costs associated with fair housing enforcement activities. In FY2025 there is an emphasis on providing SEE funds for agencies that conduct their own Intake. These funds will be made on a formula basis and decisions for SEE funds from FHAP agencies will be made in headquarters, with the actual fund commitment taking place in the field as with all other FHAP funds. Eligibility, use, and control of 2025 SEE funds is detailed at Attachment E.

## IV. Questions and Technical Support

Any questions with respect to the 2025 FHAP Guidance Package should be directed to the appropriate FHEO Region Director and GTR/GTM official. Regional staff will consult with the FHEO FHAP Division in HUD Headquarters as necessary to provide technical assistance concerning this Guidance.

Attachment A – *Criteria for Processing*
Attachment B – *Standards for Timeliness*
Attachment C – *FY2025 Payment Amounts for FHAP Case Processing*
Attachment D – *Using HUD Systems*

Attachment E – *FY2025 Partnership and Special Enforcement Effort Funds*
Attachment F – *Mandatory HUD Grant Agreement Provisions*

# ATTACHMENT A

## FY2025 Criteria for Processing

The Criteria for Processing (Criteria) are the standards by which HUD determines whether a complaint, cognizable under the federal Fair Housing Act and processed by a substantially equivalent state or local agency, meets the minimum requirements for quality and timeliness, and identify the documents that must be submitted to HUD in order to receive reimbursement. The Criteria are designed to assure the uniform, timely, and quality processing of housing discrimination complaints processed under substantially equivalent fair housing laws.

The Criteria are enumerated under major subheadings, most of which describe the type of closure, (*e.g.*, cause, no cause, conciliation). Subheadings I through III set out criteria that apply to most complaints. Subheadings IV through VII set forth additional criteria specific to particular types of complaint closure. For example, to meet the criteria for an administrative closure, criteria under subheadings I (Complaint Filing), II (Notification), III (Cause and No Cause Determinations), VII (Administrative Closures) may need to be met.

An agency must meet the Criteria for each complaint processed and provide all complaint-related documentation identified in the Criteria to HUD within 30 days of completion of complaint processing. Such documentation must be submitted to HUD via the HUD Enforcement Management System (HEMS). An agency's failure to input all required information in HEMS in a timely manner will negatively impact an agency's performance rating. HUD will address a failure to meet the Criteria through performance deficiency procedures including, but not limited to, technical assistance, performance improvement plans, and suspension from FHAP participation. *See* 24 C.F.R. § 115.307(a)(3) and 24 C.F.R. § 115.210.

HUD utilizes complaint closure review forms which combine the Criteria for Processing and the Standards for Timeliness into checklists for each type of complaint closure. These forms are available to FHAP agencies as an additional technical assistance tool to support high quality case processing.

## I.    COMPLAINT FILING

A.    <u>Quality Requirements</u>:

1.    All complaints must be timely filed in accordance with the substantially equivalent state or local fair housing law.

2.    All complaints must be in writing, signed by the complainant, and contain the following information:

   a.    The name and address of complainant;

   b.    The name and address of each respondent;

   c.    If a specific property is involved, the property's address and physical description, such as apartment, condominium, house or vacant lot; and

   d.    A concise statement of the facts, including pertinent dates, constituting the alleged discriminatory housing practice.

3.    Where the agency determines that there is insufficient information in the complaint to commence an investigation, the agency must notify the complainant in writing by no later than the fifth (5) day after receipt of the complaint and inform the complainant what information he or she must provide in order to commence an investigation and identify a reasonable timeframe for submitting such information. The agency must notify the complainant that unless he or she provides the required information within the specified timeframe, the agency may dismiss the complaint.

4.    The FHAP agency must permit complaints to be filed with the assistance of an authorized representative or organization of the complainant.

5.    The FHAP agency must permit complaints to be reasonably and fairly amended at any time.  Such amendments may include, but are not limited to:

   a.    amendments to cure technical defects or omissions;

   b.    clarification, amplifications, or amendments of allegations in a complaint; or

   c.    joinder of additional or substitute respondents.

   The FHAP agency should consider amended complaints as having been filed on the date the original complaint was filed.

6.    If a FHAP agency requires complaints to be notarized, HUD will not reimburse the agency for a complaint not filed because the complainant did not get the complaint

2

notarized. To preserve the rights of aggrieved persons, a FHAP agency must refer such complaints to HUD for investigation under the federal Fair Housing Act as soon as practicable and, where necessary, consent to their reactivation.

7. Pursuant to 24 CFR § 115.210, and the March 7, 2001, memorandum entitled "Limitations on Accepting as Dual-Filings FHAP Cases That Implicate First Amendment," HUD will not reimburse FHAP agencies for complaints that implicate the First Amendment of the U.S. Constitution. The FHAP agency must alert HUD to complaints that it receives that may implicate the First Amendment so that HUD may analyze the complaint and determine if reimbursement is appropriate. These cases include those that are premised on additional protections afforded by state or local law to individuals based on sexual orientation or gender identity or expression that may implicate the first amendment rights of the respondent.

8. Pursuant to a Memorandum of Understanding between HUD and the Internal Revenue Service, the FHAP agency must identify in HEMS whether the property named in a complaint receives Low Income Housing Tax Credits. This is required for every complaint.

9. The FHAP agency must refer complaints to HUD when the agency receives allegations involving a practice that is not prohibited by the substantially equivalent State or local law, but which is prohibited by the federal Fair Housing Act.

10. FHAP agencies should only submit any cases for reimbursement that have a clear, primary basis in a prohibited characteristic that is covered by the plain language of the federal Fair Housing Act. For example, the Fair Housing Act prohibits discrimination based only on the following specifically protected characteristics: race, color, national origin, religion, sex, familial status, and disability. The Fair Housing Act does not include protections related to sexual orientation, gender identity, and gender expression; "source of income"; criminal records; height and weight; nor limited English proficiency. Any submitted complaints based on rights not expressly found in the federal Fair Housing Act and other relevant federal civil rights law will not be reimbursed.

11. If a housing discrimination complaint is filed against a recipient of federal financial assistance and therefore implicates civil rights laws that FHEO enforces other than the federal Fair Housing Act (multi-jurisdictional), the FHAP agency shall notify FHEO so that FHEO may process that portion of the complaint. Other civil rights laws enforced by FHEO include:

   a. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) (prohibiting discrimination on the basis of race, color or national origin in programs or activities receiving federal financial assistance);

   b. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

3

(prohibiting discrimination based on disability in programs or activities receiving federal financial assistance);

    c.    Section 109 of the Housing and Community Development Act of 1974, 42 U.S.C. § 5309 (prohibiting discrimination on the basis of race, color, national origin, religion or sex in any program or activity funded in whole or in part by the community development block grant programs);

    d.    Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (prohibiting discrimination based on disability in programs, services and activities made available by public entities);

    e.    Architectural Barriers Act, 42 U.S.C. § 4151 *et seq.* (providing that buildings, including publicly owned residences, designed constructed, leased or altered with certain federal funds must be accessible to persons with disabilities); and

    f.    Age Discrimination Act of 1975, 42 U.S.C. § 6101 (prohibiting discrimination based on age in programs or activities receiving federal financial assistance).

B.    <u>Required Documents</u>: A signed, dated copy of the complaint, any requests for amendment(s) to the complaint, and evidence of compliance with the timeframes and requirements identified above.

C.    <u>Complaint Filing with Multiple Complainants or Respondents</u>: FHAP agencies will be reimbursed only for complaints that involve separate, distinct discriminatory actions that require a separate investigation. Where allegations may be made against two or more respondents, separate complaints should be filed against each respondent <u>only when each respondent's conduct stands alone as a separate violation of the Act</u>. Furthermore, if complainants are married and both are aggrieved persons, a single, joint complaint should be filed. If there are children under age 18 who reside in the household who may have been injured by the alleged discriminatory housing practice(s), they should be listed as "Other Aggrieved Persons" on that same complaint. FHAP agencies should not typically file separate complaints for spouses or children under 18 residing in the household.

## II.    NOTIFICATION

A.    <u>Quality Requirements</u>: The FHAP agency must notify HUD within five (5) days of receiving complaints that are cognizable under the federal Fair Housing Act. In addition, the FHAP agency must serve notice of the complaint to each complainant and respondent in accordance with the timeframes identified in the substantially equivalent law and the following requirements.

    1.    The notification letter to the complainant must consist of an acknowledgement of

receipt of the complaint for filing, the designation of a complaint number, information related to the agency's processing procedures including the name and telephone number of a FHAP agency contact, and the complainant's rights and obligations under the substantially equivalent law, including time limits and choice of forums.

2.  The notification letter to each of the respondents must consist of a description of the alleged housing discrimination practice upon which the complaint is based, include a copy of the complaint, and identify the name and telephone number of a FHAP agency contact.  The notice to each respondent must advise the respondent of his or her procedural rights and obligations, including the right to file an answer within the timeframe identified in the substantially equivalent law.

3.  A person who is not named as a respondent in a complaint, but who is identified as a respondent in the course of the investigation, may be joined as an additional or substitute respondent by service of a written notice.  The notice must explain the basis for the agency's belief that the joined person is properly joined as a respondent and include information identified in paragraph 2 above.

B.  <u>Required Documents</u>:  For complaints that are filed directly with the FHAP agency, the agency must enter information in HEMS regarding the complaint within five days of receiving the complaint, sufficiently notifying HUD of the complaint.  In addition, the agency must provide HUD with a copy of the notification letters sent to the parties and must update HEMS to indicate when the agency sent the notification letters.

## III.  CRITERIA FOR CAUSE AND NO CAUSE DETERMINATION

Every cause or no cause determination must be based on an investigation that includes sufficient consideration of the complainant's and respondent's evidence, and a sufficient evaluation of any and all conflicting evidence.  A cause or no cause determination must be based on a review of all relevant evidence the agency obtained during the investigation. The agency shall not act as an advocate for either the complainant or respondent and shall weigh the evidence objectively in light of the relevant substantially equivalent law.  The basis for the cause or no cause determination must be well-documented.

A.  <u>Quality Requirements</u>:

In addition to the criteria set forth in subheadings I and II above:

1.  Before the end of the 30th day after the complaint is filed, the FHAP agency must initiate a comprehensive investigation of issues raised in the complaint. Respondent's defenses, relevant policies and practices, as well as all other relevant data, must be identified and analyzed and the complainant, respondent, and all relevant witnesses must be interviewed.  Contradictions between complainant's allegations and respondent's response must be investigated and when applicable, comparative data must be obtained.  <u>Information must be independently</u>

corroborated.  Simply obtaining respondents' statements rebutting complainant's allegations is insufficient to resolve disputed issues of fact.

2.  HUD recommends that FHAP agencies develop investigative plans for every complaint processed that is cognizable under the Fair Housing Act. For guidance on developing an investigative plan, FHAP agencies should refer to Chapter 7 of HUD Handbook 8024.01 REV-2 (Title VIII Complaint Intake, Investigation, and Conciliation Handbook).

3.  In planning the investigation, the investigator and his or her supervisor must determine, on a complaint-by-complaint basis, whether on-site inspections and/or interviews are required.  For most complaints, on-site inspections and/or interviews are the most thorough way to conduct an investigation.  Some cases, *e.g.*, where the complaint does not involve factual disputes or where evidence clearly demonstrates the allegations do not have merit, may not require an on-site visit.

4.  During the period beginning with the filing of a complaint and ending with the FHAP agency's determination or charge of discrimination, the agency, to the extent feasible, must attempt to conciliate the complaint (*see* more detail on criteria for conciliation in Section V of this document).

5.  If the agency does not complete the investigative activities with respect to a complaint within 100 days from the date of receipt, it must notify the parties in writing of the reason(s) for the delay.  Such notification letters must be sent within 110 days of the filing of the complaint.

6.  At the end of each investigation, the agency shall prepare a Final Investigative Report (FIR).  A FIR shall be dated and signed by at least one supervisor.  The FIR shall contain:

    a.  The names and dates of contacts with the parties and witnesses, except that the report will not disclose the names of witnesses who request anonymity;

    b.  A summary of correspondence and other contacts with the complainant and the respondent;

    c.  A summary description identifying other pertinent records examined;

    d.  A summary of statements by witnesses, if applicable; and/or

    e.  Interrogatories and answers provided, if applicable.

7.  Each Determination shall be signed and dated by an authorized FHAP official.

8.  The FHAP agency shall send the closure package to HUD within 30 days of closure. (See B below).

6

9.    The FHAP agency will cooperate with HUD by providing information at regular intervals or upon request related to individual complaint investigations.  Upon request, the FHAP agency shall provide status reports for each complaint that is over 100 days old.

B.    <u>Required Documents</u>:    The case file shall include all evidence indicating that a comprehensive investigation was commenced and completed in accordance with the above requirements including, but not limited to: a copy of a signed, dated complaint; a copy of a FHAP agency determination, dated and signed by an authorized FHAP official; proof that a FHAP agency sent its determination letter to all parties; an FIR that meets the above listed requirements; an investigative plan (when such plan exists); a copy of the 100-day letters and evidence that they were sent, if applicable; and all other information pertinent to the investigation, including but not limited to interview notes, documentation of conciliation attempts and, when necessary, independent evidence corroborating respondent's defense(s).

## IV.   CRITERIA   FOR   POST-CAUSE   COMPLAINTS   HEARD   IN   AN ADMINISTRATIVE HEARING, CIVIL ACTION, OR THROUGH JUDICIAL REVIEW

In addition to the appropriate criteria set forth in subheadings I, II, and III above:

A.    <u>Quality Requirements</u>:  After a cause determination and a charge of discrimination, or its equivalent, has been issued, and assuming the conciliation was attempted and failed, the complaint must be referred to appropriate counsel to prosecute the charge on behalf of the complainant, at government expense, before an administrative hearing body or civil court.

B.    <u>Documents Required</u>:  HUD will accept such a complaint for reimbursement if the agency provides documentation of such a referral in, for example, correspondence, logs or pleadings.  Additionally, the FHAP agency shall provide any final administrative hearing decision, consent decree, or settlement agreement entered to HUD within 30 days of such action.  If the agency does not provide this information, HUD may request, and the agency will be required to return, up to 50% of the reimbursement previously paid to the agency for the complaint.

> **\*\*\*<u>NOTE</u>**:  While the agency may obtain reimbursement on these complaints prior to final disposition by an administrative hearing body or a civil court, the agency must subsequently report to HUD the final status of such complaints.  *See* 24 C.F.R. § 115.206(e)(8).  FHAP agencies must input final status information directly in HEMS within 30 days of the administrative or judicial determination.

C.    <u>Post-Cause Administrative Hearings or Judicial Filings</u>: An agency may receive additional funds for engaging in certain post-cause enforcement actions.   If, pursuant to the substantially equivalent law, an agency either conducts an administrative hearing or files a civil action upon election to enforce a finding of reasonable cause, HUD may provide additional payment.

7

Where the triggering event (*i.e.*, conduct of administrative hearing or filing of civil action) for the supplemental payment does not occur, an agreement reached after a cause finding will not qualify as an enforcement action for purposes of this supplemental payment. Such cases will be reimbursed as any other cause case unless the disposition is a conciliation agreement (*i.e.*, an agreement signed by the parties <u>and</u> the FHAP agency), in which case it will be reimbursed as any other case closed with a conciliation agreement. Where the triggering event has occurred, a FHAP agency will receive the supplemental payment even where the case is resolved by a subsequent agreement, *e.g.*, through a consent decree.

<u>Agencies will receive this increased supplemental payment when the agency has engaged in post-cause enforcement actions and has documented its actions in HEMS.</u> This documentation must occur in order for the GTR/GTM to authorize payment.

## V.   CRITERIA FOR CONCILIATION

During the period beginning with the filing of a complaint and ending with the agency's no cause determination or charge of discrimination, the agency, to the extent feasible, must attempt to conciliate the complaint. In conciliating a complaint, agencies must attempt to achieve a just resolution of the complaint and obtain assurances that the respondent will satisfactorily remedy any violations of the rights of the complainant and take actions to ensure the elimination of alleged discriminatory housing practices and the prevention of their occurrences in the future. These standards for conciliation remain in effect even if conciliation/settlement takes place after the agency's cause determination.

A conciliation should provide both substantive individual relief for the complainant together with meaningful and effective public interest relief. Substantive individual relief includes both monetary relief and other affirmative relief required to make the complainant whole (e.g., approval or restoration of a housing opportunity, approval of a reasonable accommodation or reasonable modification request). The monetary relief afforded to the complainant should not be de minimis; it should compensate the complainant(s) for the harm alleged and be commensurate with relief obtained in other similar cases.

Public interest relief can take a variety of forms depending on the circumstances of a given complaint. Generally, it means the conciliation agreement contains certain provisions such as implementation of nondiscriminatory policies; changes to existing policies and practices; attendance at fair housing training; and/or other action that provides remediation or relief for individuals other than a complainant(s). Public interest relief may also encompass prospective relief such as agreeing to ongoing testing to assure compliance; agreeing to make changes in policies at all a respondent's properties (not just the subject property); participation in education and outreach activities; and/or other affirmative relief that protects the public interest.

FHAP agencies should be aware that a pattern of requiring only fair housing training is not meaningful public interest relief. HUD monitors will consider in every case whether other reasonable, appropriate forms of public interest should have been considered. Additionally,

public interest relief cannot be meaningful or effective unless reporting and recordkeeping provisions are included to ensure that all required actions are completed. A conciliation should provide both substantive individual relief and meaningful / effective public interest relief and such relief should be recorded into the HEMS record.

In addition to the appropriate criteria set forth in subheadings I, II, and III above:

A.  <u>Quality Requirements/Required Documents</u>:  The FHAP agency must provide HUD with a signed and dated complaint, a chronology of actions taken up to the conciliation, copies of closure letters sent to the parties indicating that the complaint was closed due to a successful conciliation, together with a copy of the executed conciliation agreement.

The conciliation agreement must be in writing, dated and signed by complainant, respondent, and the authorized FHAP agency representative, and include:

1.  HUD and FHAP complaint numbers;

2.  Names of the parties;

3.  Address and description of the subject property;

4.  An effective date and the term in which the agreement remains in effect;

5.  Relief that remedies the discrimination alleged in the complaint or is otherwise agreed upon by the parties and appropriate based on evidence obtained in the investigation of the matter;

6.  As appropriate, relief that adequately vindicates the public interest, and prohibits future discriminatory housing practices by respondent;

7.  A statement that the agreement constitutes closure of the complaint at HUD and the FHAP agency;

8.  A statement that the agreement shall be made public unless the complainant and respondent otherwise agree, and an authorized representative of the agency determines that disclosure is not required to further the purposes of the substantially equivalent law.  Circumstances that may result in partial or complete nondisclosure of a conciliation agreement may include, but are not limited to:

    •  Sexual harassment claims;

    •  A complainant's physical or mental condition, or medical diagnoses; or

    •  The fact that a complainant is a resident in a domestic violence shelter or other protected residence which complainant believes may, if disclosed, be a safety risk.

9

9.   Provisions that allow the FHAP agency to effectively monitor compliance with the agreement; and

10.  A statement that violations of other civil rights laws have been alleged (if applicable).

***NOTE:** A conciliation agreement does not prohibit HUD from taking action against respondent under other civil rights laws.  When a complaint is subject to concurrent processing by HUD under other civil rights laws, the FHAP agency may not execute an agreement that resolves matters in regard to these laws without HUD's consent.

## VI.   CRITERIA FOR CLOSURES BY SETTLEMENT WITHOUT FHAP AGENCY INVOLVEMENT (A.K.A., WITHDRAWALS WITH RESOLUTION)

If complainant and respondent resolve the complaint without the FHAP agency's involvement, the complainant may withdraw the complaint by submitting a withdrawal request to the FHAP agency.

In addition to the appropriate criteria set forth in subheadings I, II, and III above:

A.   Quality Requirements.  The withdrawal request must be written; it must be signed and dated by complainant or complainant's authorized representative; identify the respondent(s) to whom the withdrawal applies; contain the HUD and FHAP agency complaint numbers; state the reason(s) complainant seeks to withdraw the complaint; contain a statement that the withdrawal was not obtained by coercion or threat of retaliation from any person, including but not limited to the respondent; and identify the terms of the resolution.

B.   Required Documents:  The FHAP agency must provide FHEO with: a signed and dated complaint; a chronology of the FHAP agency actions prior to the withdrawal request; a copy of the signed and dated withdrawal request; documentation showing that the agency notified the complainant and respondent that the investigation would be terminated as a result of the withdrawal, and that the complainant could re-file the complaint if the terms of the resolution are not satisfied and the re-filing is received within the time limit for filing a complaint under the substantially equivalent law; and a copy of the closure letter.

NOTE: The FHAP agency must not encourage or facilitate resolution without its involvement in lieu of proceeding with conciliation.  If HUD discovers that such occurred, it will be addressed through performance deficiency procedures.

## VII.  CRITERIA FOR ADMINISTRATIVE CLOSURES

Performance Standard 2 in the FHAP regulations, at 24 C.F.R. § 115.206(e)(2), requires that administrative closures only be utilized in limited and appropriate circumstances.  It is critical that FHAP agencies not close complaints administratively except under the specific

10

circumstances set forth below.

A.  <u>Withdrawals without Resolution</u>.  If complainant decides to withdraw a complaint, even though the complaint has not been resolved, complainant must submit a withdrawal request.

   In addition to the appropriate criteria set forth in subheadings I, II, and III above:

   1.  <u>Quality Requirements</u>:  The withdrawal request must: be written; signed and dated by complainant or complainant's authorized representative; identify the respondent(s) to whom the withdrawal applies; contain the HUD and FHAP agency complaint numbers; state the reason(s) complainant seeks to withdraw the complaint; contain a statement that complainant is aware that the withdrawal terminates the FHAP agency's investigation; contain a statement that the withdrawal was not obtained by coercion or threat of retaliation from any person, including but not limited to the respondent.

   2.  <u>Required Documents</u>:  The FHAP agency must provide FHEO: a signed and dated complaint; a chronology of FHAP agency actions prior to receipt of the withdrawal request; a copy of the signed and dated withdrawal request that meets the Quality Requirements set out above; and a copy of the closure letter provided to all parties indicating closure due to withdrawal by complainant without resolution.

   \*\*\***NOTE:**  If the withdrawal request indicates that there was coercion or threat of retaliation FHAP payment may be denied.

B.  <u>Inability to Locate Complainant</u>.  The FHAP agency may administratively close a complaint when additional information is needed from complainant and he or she cannot be located.

   In addition to the appropriate criteria set forth in subheadings I, II, and III above:

   1.  <u>Quality Requirements</u>: If correspondence sent by the agency is returned with an indication that the complainant moved and left no forwarding address, the agency must take the following progressive steps to locate the complainant before administratively closing the complaint:

      a.  Place at least four telephone calls to complainant's residence, cell phone number, and place of employment, two during normal business hours to work number and two during non-business hours to a residential/cell number.  If an email address is available, the agency must attempt to email the complainant at least two times.

      b.  Attempt to contact persons identified by complainant at intake to inquire as to complainant's whereabouts.

      c.  Check other sources in an effort to obtain complainant's current contact information (*e.g.*, telephone directory, Internet searches, postal

11

service, 411 information, utility company, or witnesses previously identified by complainant).

d.  Send a letter to the complainant's last known address by certified mail, advising complainant of the agency's intent to close the case unless complainant contacts the agency within ten days.  If the tenth day elapses without a response, the case may be closed administratively by means of a written notice sent to all parties, including complainant at complainant's last known address.

***NOTE:** If the FIR shows that the complaint was closed due to the inability to contact complainant without following the steps outlined above, the FHAP agency will not be reimbursed for processing the complaint.

2.  <u>Required Documents</u>:  The FHAP agency must provide the following documentation to FHEO:  a signed and dated complaint; evidence that the above progressive steps were taken to locate complainant; evidence that the certified letter was returned unclaimed, and a copy of the closure letter sent to the parties indicating closure due to inability to locate complainant.

C.  <u>Inability to Locate Respondent</u>

In addition to the appropriate criteria set forth in subheadings I, II, and III above:

1.  <u>Quality Requirements</u>:  A FHAP agency must make every effort to identify the correct name and address of each respondent in a complaint.  However, there may be circumstances where a respondent cannot be identified or located.  If the complaint identifies multiple respondents and only one cannot be adequately identified, the agency must not close the complaint administratively.  Rather, the investigation must proceed and further efforts must be made during the investigation to identify the respondent whose correct name or address remains unknown.  The complaint may be amended to remove those respondents who could not be located.

If a sole respondent or all respondents cannot be identified or located, the complaint may be closed administratively if the agency first takes the following steps:

a.  The FHAP agency must attempt to obtain additional information from available sources that could result in identifying or locating the respondent, including Internet searches, cell phone numbers, cross reference directories, or property tax records that may identify the owner or prior residents of the property in question and provide enough information to identify or locate the respondent, serve the complainant, and begin the formal investigation.

b.  If a source appears to know the identity or location of a respondent that

the FHAP agency seeks, but that source refuses to provide the information voluntarily, the FHAP agency must subpoena the information.

 c. As appropriate, the FHAP agency should attempt an on-site visit, which may help locate and identify the respondent.

 d. If the above efforts to locate or identify the respondent are unsuccessful, a letter must be sent to the complainant giving him or her 10 days to provide information needed to locate or identify respondents.

 ***NOTE:** In the absence of sufficient information, the case may be closed administratively, and written notice by regular and certified mail should be sent to the parties.

 2. <u>Required Documents</u>: The FHAP agency must provide the following documentation to FHEO: a signed and dated complaint; evidence that the above progressive steps were taken to locate the respondent, including the signed letters identified in 1(d) above giving notice to complainant or complainant's representative, evidence that certified letters were returned unclaimed, and closure letters to complainant or complainant's representative indicating inability to locate respondent(s).

D. <u>Failure of Complainant to Cooperate with the Investigation</u>. A complaint may be administratively closed when complainant fails to respond to reasonable requests for information that is needed in order for the FHAP agency to make a determination.

In addition to the appropriate criteria set forth in subheadings I, II, and III above:

 1. <u>Quality Requirements</u>:

 a. The FHAP agency must inform the complainants and their representatives of their duty to cooperate with the investigation and the risk of the agency administratively closing the complaint if they fail to cooperate.

 b. The FHAP agency must make repeated attempts to contact complainants and their representatives by telephone and mail requesting the needed information. If these efforts are fruitless, the FHAP agency must send a letter to the complainant by certified mail return receipt giving complainant at least ten days from receipt of letter to provide the needed information to the agency.

 c. If the complainant's cooperation cannot be obtained using the above procedures, and the letter is not returned by the post office (i.e., marked addressee unknown, moved, left no forwarding address, etc.), the complaint should then be closed for failure to cooperate.

13

    d.    If the complaint is closed for failure of complainant to cooperate with the investigation, a closure letter must be sent to the complainant.

2.    <u>Required Documents</u>: The following documents must be provided to FHEO:  a signed and dated complaint; evidence that the above progressive steps were taken to obtain complainant's cooperation, including the signed letter identified in 1(b) above giving notice to the complainant or the complainant's representative; and a copy of closure letter to the parties indicating closure because of failure of complainant to cooperate with the investigation.

E.    <u>Lack of Jurisdiction</u>

In addition to the appropriate criteria set forth in subheadings I, II, and III above:

1.    <u>Quality Requirements</u>:  In order to qualify for reimbursement, the lack of jurisdiction must not have been apparent on the face of the complaint at the time of filing, and must have become known only after further investigation.  The following are examples of facts uncovered during an investigation that may justify reimbursement for an administrative closure for lack of jurisdiction:  a) the complainant has not suffered the alleged harm needed to establish standing; b) the subject property qualifies for an exemption to coverage of both the Fair Housing Act and the substantially equivalent law.  Note that if HUD, but not the agency, has jurisdiction over the complaint, the complaint must be referred to HUD for processing.

2.    <u>Required Documentation</u>:  The FHAP agency must provide the following documentation to FHEO: reason(s) for closing the complaint for lack of jurisdiction that demonstrates why HUD does not have jurisdiction, and that the lack of jurisdiction could not have been determined at intake; copies of closure letter sent to the parties that indicate reason for lack of jurisdiction closure, identify FHAP and HUD complaint numbers, and are signed by authorized FHAP agency official.

F.    <u>Trial has Begun</u> A complaint must not be closed merely because an aggrieved party has filed a civil action with respect to the same alleged discriminatory housing practice(s).

In addition to the appropriate criteria set forth in subheadings I, II, and III above:

1.    <u>Quality Requirements</u>:  No additional criteria.

2.    <u>Required Documents</u>:  To receive reimbursement for an administrative closure due to the commencement of a judicial trial the FHAP agency must produce: a document from the clerk of the court in the jurisdiction that hears the complaint or other sufficient documentation demonstrating that a trial has begun.

14

## ATTACHMENT B

## FY2025 Standards for Timeliness

### Closures of Investigated Complaints

100 days or less:

- Non-systemic complaints, not novel or complex, that are settled or conciliated. Includes withdrawals with resolution.

- Non-systemic complaints, not novel or complex, where a cause or no cause decision has been made.

300 days or less:

- Systemic complaints that are novel or complex, that are settled or conciliated.  Includes withdrawals with resolution.

350 days or less

- Systemic complaints that are novel or complex, where a cause or no cause decision has been made.


### Administrative Closures

Inability to locate:                        100 days or less

Lack of jurisdiction:                       30 days or less

Failure to cooperate:                       60 days or less

Withdrawal without resolution:              75 days or less

Closed because trial commenced:             N/A

Complaints that are reactivated:            N/A


### Post-cause Enforcement and Final Disposition Actions

Upload final status information:            30 days after final order or agreement

## ATTACHMENT C

## FY2025 Payment Amounts for FHAP Complaint Processing

**Conciliation**:                                                                 $3,400

**Full Investigation (issue determination)**:                    $3,600

**Post-cause enforcement action supplemental payments:**

- **Administrative Hearing held:**                            $5,000

- **Civil Action filed:**                                              $8,000

**Administrative Closures:**                                          $1,600

**Withdrawals with Resolution:**                                   $1,600

A conciliation should provide both substantive individual relief for the complainant <u>together with</u> meaningful and effective public interest relief. Substantive individual relief includes both monetary relief and other affirmative relief required to make the complainant whole (*e.g.*, approval or restoration of a housing opportunity, approval of a reasonable accommodation or reasonable modification request). The monetary relief afforded to the complainant should not be *de minimis*; it should compensate the complainant(s) for the harm alleged and be commensurate with relief obtained in other similar cases.

Public interest relief can take a variety of forms depending on the circumstances of a given complaint. Generally, it means the conciliation agreement contains certain provisions such as implementation of nondiscriminatory policies; changes to existing policies and practices; attendance at fair housing training; and/or other action that provides remediation or relief for individuals *other than a complainant(s)*. Public interest relief may also encompass prospective relief such as agreeing to ongoing testing to assure compliance; agreeing to make changes in policies at all a respondent's properties (not just the subject property); participation in education and outreach activities; and/or other affirmative relief that protects the public interest.

FHAP agencies should be aware that <u>a pattern of requiring only fair housing training is not meaningful public interest relief</u>. HUD monitors will consider in every case whether other reasonable, appropriate forms of public interest should have been considered. Additionally, public interest relief cannot be meaningful or effective unless reporting and recordkeeping provisions are included to ensure that all required actions are completed. A conciliation should provide <u>both *substantive* individual relief and *meaningful / effective* public interest relief and such relief should be recorded into the HEMS record.</u>

# ATTACHMENT D – USING HUD SYSTEMS

## LOCCS Security Procedures (FHAP)

The Line of Credit Control System (LOCCS) is the primary grant disbursement system for HUD programs, including the Fair Housing Assistance Program (FHAP). Grant disbursements are facilitated via the internet through the eLOCCS system. As participants in the FHAP, substantially equivalent state or local agencies are permitted access to LOCCS and eLOCCS.

The Department's Rules of Behavior and security guidelines require that the Approving Official for LOCCS transactions be the CEO, Board Officer, or Agency Director of an organization. An "Approving Official" is a LOCCS administrator who manages "users" in LOCCS. The Approving Official cannot be an individual serving in an interim or acting position and must have decision-making authority for the organization. **The Approving Official is the only individual permitted to be the Secure Connection Coordinator, and those duties may not be delegated**.

To comply with IT Security guidelines, each individual with access to LOCCS must safeguard his/her User ID and Password. User IDs and Passwords must **NOT** be shared with others. Only **authorized** users should access LOCCS. **Please note**: there is a requirement for a separate LOCCS User ID and password from Secure Systems access for both users and approving officials.

In the event the authorized user leaves the organization, the HUD Government Technical Representative (GTR) assigned to the current grant must be notified and a form HUD-27054 must be submitted to the GTR to terminate the employee who has left the organization and to authorize a new user, to be identified by the FHAP agency.

HUD embraces a "Zero Tolerance Philosophy" for failure to secure important financial information. Failure to abide by conditions above or the general *Rules of Behavior* below applicable to all HUD computer systems will result in the following consequences: access for the individual will be terminated and **will not be reinstated**. The FHAP agency will be required to identify another individual to assume the role of the disqualified individual (*i.e.*, as the approving official or authorized user).

## Rules of Behavior for HUD Systems

The U.S. Department of Housing and Urban Development has granted access to the FHAP agency to utilize the Department's automated information resources (*e.g.*, HEMS). As a condition of receiving this access the Agency is required to be aware of the Department's system security policies and to abide by these policies. Security policy emphasizes awareness practices for the purpose of safeguarding the Department's valuable information resources.

The system user identification (USERID) and password issued to users are the FHAP agency's means to access these resources. They are to be used solely in connection with the performance of the responsibilities as set forth in the job description, contract or agreement(s) with the Department. Use by anyone other than authorized users are expressly prohibited. The authorized user agrees to be responsible for the confidentiality of the assigned information and accountable for all activity with their user identification (USERID).

## ATTACHMENT D –USING HUD SYSTEMS

Further, users agree that you will not provide this confidential USERID/password to another user nor will the user sign on to HUD systems so that another person may access or operate the workstation in the user's absence or on their behalf. *Actions of this type constitute a breach of system security and will result in immediate termination of your assigned USERID/password from the system.*

*In addition, authorized users agree to:*

(a) Log-off the system when leaving the system/workstation area;

(b) Refrain from leaving written passwords in the workstation area;

(c) Avoid creating a personal password that can be easily associated with you;

(d) Avoid posting printouts of sensitive output data on bulletin boards;

(e) Avoid leaving system output reports unattended or unsecured;

(f) Control input documents by returning them to files or forwarding them to the appropriate contact person in your office;

(g) Avoid violation of the Privacy Act which requires confidentiality of personal data contained in government and contractor data files;

(h) Immediately contact the HUD Inspector General's Office, as appropriate, regarding any suspected violation or breach of system security;

(i) Cooperate in providing personal background information to be used in conducting security background checks to the extent required by Federal regulations;

(j) Respond to any inquiries and requests for information you may receive from either the HUD Headquarters or management officials regarding system security practices.

(k) Protect all electronic/optical media and hardcopy documentation containing sensitive information and properly dispose of it by shredding hardcopy documentation, or by contacting the HITS Help Desk to dispose of electronic/optical media.

(l) Avoid saving sensitive HUD information on the local drive of a laptop, personally owned computer, or other mobile or portable technology ("flash drives", removable/external hard drives, etc.).

(m) If sensitive data must be stored on any type of HUD-approved mobile/portable technology (laptops, removable hard drives, "flash drives", etc.), ensure that it is protected via encryption.

(n) Individuals who telework or remotely access HUD information should do so only through approved remote access solutions (such as hudmobile.hud.gov), and should safeguard all sensitive information accessed in this manner.

<u>**ATTACHMENT E**</u>

**FY2025 PARTNERSHIP AND SPECIAL ENFORCEMENT EFFORT FUNDS**

This attachment contains important details regarding eligibility and application procedures for FY2025 Fair Housing Assistance Program (FHAP) Partnership funds and Special Enforcement Effort (SEE) funds under the authority set forth at 24 C.F.R. § 115.304(d) and § 115.305.

## I.    GENERAL PURPOSE AND AGENCY ELIGIBILITY

The purpose of Partnership funds is for an agency to utilize the services of individuals and/or public, private, for-profit, or not-for-profit organizations that have the expertise needed to effectively carry out the provisions of the agency's fair housing law. SEE funds are also available for agencies to enhance enforcement activities of the agency's fair housing law.

All agencies currently participating in FHAP that are eligible to receive contributions funds are eligible to receive an award of 2025 Partnership funds, **<u>except for</u>** those agencies that are suspended. Agencies that are on a Performance Improvement Plan (PIP) may be eligible for Partnership funds, subject to discretion of the Government Technical Representative (GTR) and Regional Director. Agencies that qualify for a Partnership award are also eligible to receive 2024 SEE funds, subject to the requirements in 24 C.F.R. § 115.305.

## II.    2025 PARTNERSHIP FUNDS

### A.  Specific Use of 2025 Partnership Funds

Under the authority set forth at 24 C.F.R. § 115.304(d), HUD is making a total of up to $600,000 in 2025 Partnership funds available to eligible agencies. The use of Partnership funds awarded in 2025 **<u>is restricted to</u>** education and outreach activities.

In cases where the respective GTR and Regional Director determines that the funds are sufficient and the agency has the capacity to effectively undertake both activities, an agency may receive authorization from the GTR to engage in both.

*i.   Education and Outreach Activities*

Funds under this activity are provided for the purpose of conducting education and outreach to persons residing in the geographic area served by the agency, as well as education and outreach to persons and entities subject to the agency's fair housing law. Consistent with the purpose of Partnership funds, agencies should, to the maximum extent possible, partner with grassroots, faith-based or other community-based organizations in accomplishing the goals of this Partnership funding. Education efforts complement the mission of agencies by helping to ensure open and inclusive communities. Activities may include, but are not limited to, staging of public events and the production (including contracting for) of informational and promotional materials. Material and activities should stress the relationship between HUD and FHAP funded agencies, as well as the agency's responsibilities for enforcement of its own substantially equivalent fair housing law.

## B.  Award Amount of 2025 Partnership Funds

HUD has a total of up to $600,000 available for Partnership activities in 2025. The size of the awards will be dependent on the demonstrated need. Where a State has both State and local FHAP funded agencies, the State agency should avoid expending its efforts in the same geographic area as the local agency(ies). This year distribution of these funds will not be made on a formula basis. Decisions on requests for Partnership funds from FHAP agencies will be made in headquarters on a case-by-case basis, with the actual fund commitment taking place in the field as with all other FHAP funds.

## C.  Additional Guidance Regarding Partnership Funds Deliverables

Where funds are used to produce education and outreach materials, such materials may include use of existing materials from previous education and outreach efforts (so long as they are in line with the Department's current priorities, including those in Attachment F, "*Mandatory FHAP Grant Agreement Provisions*"), but an agency should seek to expand the impact of those efforts by reaching additional audiences. New materials and strategies may also be developed, including the use of webinars, development and dissemination of PowerPoint presentations, publicizing the availability of materials developed, and the utilization of social media for education and public service announcements.

Deliverables may also include written educational materials such as brochures,  fliers,  fair housing  posters,  and  other  educational and training material such as videos  or power points for  identified  audiences  suitable for providing fair housing education.  Graphic materials  may  include,  but  are not limited to, separately produced and printed  posters,  bus advertisements, online advertisements, or other outreach materials to be distributed to targeted audiences  physically  or through  social media that are  designed to educate individuals, organizations, and housing providers about the provisions of the State or local fair housing law in connection with the specific topic areas identified above.

## III.    2025 SPECIAL ENFORCEMENT EFFORT FUNDS

2

This attachment contains important details regarding the operation of the 2025 SEE funds, which is being provided under the existing authority set forth at 24 C.F.R. § 115.305. This guidance covers the operation of the SEE Enforcement Fund only during the effective term of the 2025 FHAP Funding Guidance. SEE funds are **on a formula** basis for agencies that do Intake for their agency. The formula is as determined by the FHAP Division and will be provided with instructions in the coming months.

### A. Specific Use of the 2025 SEE Funds

Under the authority set forth at 24 C.F.R. § 115.305, HUD is making available up to $600,000 in 2025 SEE funds to all eligible agencies. Use of 2025 SEE funds are meant to support agencies' enforcement activities and **are prioritized for the following**:

- Cover costs related to conducting intake activities.
- Supplement enforcement related costs associated with complex or protracted investigation; and
- cover extraordinary enforcement and investigation related costs associated with fair housing enforcement activities.

### B. Award Amount of 2025 SEE Funds

HUD has a total of up to $600,000 in SEE funds available in 2025. The size of the awards will be dependent on the demonstrated need and available resources and will be subject to the discretion of the FHAP Division. The distribution of these funds will be made on a formula basis. Decisions on requests for SEE funds from FHAP agencies will be made in headquarters on a case-by-case basis, with the actual fund commitment taking place in the field as with all other FHAP funds.

### C. SEE Fund Eligibility

The eligibility requirements for SEE funds are codified by the FHAP implementing regulation at 24 C.F.R. § 115.305(a) and (b). Thus, an agency requesting a distribution of funds must **meet at least three of the six baseline eligibility criteria** set forth at § 115.305(a)(1) – (6). Regardless of whether an agency meets the criteria identified above in Section I and/or the baseline criteria for SEE funds under § 115.305(a), it will nonetheless be ineligible if 20 percent or more of an agency's fair housing complaints in the current case processing period have resulted in administrative closures.

## IV. FUNDING AND PERFORMANCE DEADLINES FOR BOTH PARTNERSHIP AND SEE FUNDS

**\*NOTE:**  Depending upon expected utilization of funds (*e.g.*, agency opt-outs), HUD reserves the right to provide additional funds to an agency(ies) to achieve maximum utilization of the funds available. Additionally, HUD has authorized discretion to decline distribution of funds to any agency that unsuccessfully meets the criteria identified above.

3

The funds awarded through these 2025 Partnership and SEE awards **must be obligated on or before November 15, 2025**. Funds will be committed and obligated in accordance with the FHAP Funds Control Plan and the existing FHAP payment processes.

All requisite performance indicated in the Statement of Work (SOW) must be completed within the performance period indicated on the HUD-1044. **No requests for extensions** to the period of performance will be permitted for this award, and to ensure sufficient time for review and approval of any remaining drawdowns, **all performance in connection with both the Partnership and SEE funds must be completed no later than June 30, 2026**.

## IV. DISTRIBUTION AND CONTROL OF 2025 PARTNERSHIP AND SEE FUNDS

Eligible agencies will be required to prepare and submit a SOW to their GTR detailing the intended use of the funds. Agencies receiving both Partnership and SEE funds should draft separate SOWs for each fund type. Depending upon the amount of funding and the specifics of the SOW, a payment schedule may also be required at the discretion of the GTR. The SOW should clearly identify the proposed activities, price estimates, specific deliverables, intended audiences, and anticipated outcomes. An agency's proposed products or strategies may be modified by the GTR during the SOW approval process based on the GTR and agency's agreed positions regarding achieving the maximum benefits to the jurisdiction's geographic areas, proposed targeted populations, and/or other factors.

All funds awarded under this Attachment will be distributed through the established FHAP payment process. Award funds will be assigned to the regions for disbursement as soon as practicable after approval by headquarters, and commitment and obligation of the award will be processed by the GTR, subject to this attachment. Control of these funds will comply with the requirements in this guidance, the FHAP governing regulations at 24 C.F.R. part 115, and the *Uniform Administrative Requirements for Federal Awards* at 2 C.F.R. part 200.

## ATTACHMENT F

**MANDATORY PROVISIONS**

**These provisions apply to all Grantees:**

The Grantee:

(1) shall not use grant funds to promote "gender ideology," as defined in Executive Order (E.O.) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;

(2) agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code;

(3) certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964;

(4) shall not use any grant funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment; and that

(5) notwithstanding anything in the NOFO or Application, this Grant shall not be governed by Executive Orders revoked by E.O. 14154, including E.O. 14008, or NOFO requirements implementing Executive Orders that have been revoked.

(6) Shall abide by Presidential Executive Actions affecting federal financial assistance programs: Executive Order (EO) 14219 (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative); 14218 (Ending Taxpayer Subsidization of Open Borders); guidance resulting from the White House Task Force established by 14202 (Eradicating Anti-Christian Bias) and the Senior Advisor to the White House Faith Office assigned by 14205 (Establishment of the White House Faith Office); 14182 (Enforcing the Hyde Amendment); 14173 (Ending Illegal Discrimination and Restoring Merit-Based Opportunity); 14151 (Ending Radical and Wasteful Government DEI Programs and Preferencing); and 14148 (Initial Rescissions of Harmful Executive Orders and Actions)

(7) Shall not issue findings utilizing disparate impact liability as defined by Executive Order 14281 (Restoring Equality of Opportunity and Meritocracy)

(8) Must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws. If applicable, no state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation.



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-2000

ASSISTANT SECRETARY FOR
FAIR HOUSING AND EQUAL OPPORTUNITY

| | |
|---|---|
| MEMORANDUM FOR: | Office of Fair Housing and Equal Opportunity |
| | Fair Housing Assistance Program Agencies |
| | Fair Housing Initiatives Program Grantees |
| FROM: | John Gibbs, Principal Deputy Assistant Secretary |
| | for Fair Housing and Equal Opportunity |
| DATE: | September 17, 2025 |
| SUBJECT: | Notice of the Withdrawal of FHEO Guidance Documents |
| EFFECTIVE DATE: | Upon receipt |
| EXPIRATION DATE: | This Notice will remain in effect until amended, superseded, or rescinded |
| PURPOSE: | The Office of Fair Housing and Equal Opportunity (FHEO) is announcing the withdrawal of several guidance documents |

*Digitally signed by JOHN GIBBS Date: 2025.09.16 14:39:02 -04'00'*

**SUMMARY:**

The Office of Fair Housing and Equal Opportunity (FHEO), upon periodic review of its guidance documents, consistent with applicable law, is withdrawing the below guidance which it determines should no longer be in effect.

Consistent with the regulatory reform efforts and in accordance with Executive Order 14192 of January 31, 2025 ("Unleashing Prosperity Through Deregulation"), and Executive Order 14219 of February 19, 2025 ("Ensuring Lawful Governance and Implementing the President's 'Department of Government Efficiency' Deregulatory Initiative"), HUD is undertaking a comprehensive review of its sub-regulatory guidance to reduce unnecessary compliance burdens, enhance the effectiveness of guidance documents, and promote principles underlying the rule of law. Equal treatment under the law is a bedrock principle of the United States which guarantees equality of opportunity, not equality of outcomes. Any historical guidance, policies and interpretive rules of the Office of Fair Housing and Equal Opportunity which have not been consistent with these principles are subject to review, revision, or rescission.

This notice informs the public, including the Department's stakeholders, of the guidance documents that the Department is withdrawing through an exercise of the Department's policy-making discretion (i.e., based on a change in Department policy or statutory interpretation.)

## BACKGROUND

Agencies often issue statements that, unlike rules promulgated pursuant to legislation, do not carry the force of law. These statements include interpretative rules, which advise the public of an agency's interpretation of the statutes and regulations it administers; and general statements of policy, which advise the public about an agency's intended use of its discretionary authority. Interpretive rules and policy statements are collectively known as "guidance documents." Although guidance is a common tool for agencies to advise the public, it can sometimes be used by agencies to attempt to bind the regulated public without adequate accountability. Within these two general categories, guidance takes a variety of forms, such as explanations of how an agency intends to regulate or use its enforcement discretion; interpretations of legislative stipulations, including clarifications of technical details; compliance guides; statements that are applicable to a single or small group of regulated entities; and internal training materials. Guidance documents are not binding on agencies or regulated parties. This is because guidance documents do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

The Department of Housing and Urban Development has issued non-binding policy guidance in myriad forms over its history. This guidance has taken the form of guidance documents, interpretive rules, advisory opinions, and policy statements. In some instances, guidance promulgated by the Office of Fair Housing and Equal Opportunity may have adopted interpretations that are inconsistent with the statutory text and purport to impose compliance burdens on regulated parties outside of the strictures of notice-and-comment rulemaking. Even where the guidance might advance a permissible interpretation of the relevant statute or regulation, or afforded the public an opportunity to weigh in, it is the Department's current policy to avoid issuing guidance except where necessary and where compliance burdens would be reduced rather than increased.

The Office of Fair Housing and Equal Opportunity is conducting a review of its guidance documents and has determined to withdraw all guidance materials identified below. Such withdrawal is not necessarily final. The Office of Fair Housing and Equal Opportunity intends to continue reviewing all guidance documents to determine whether they should ultimately be retained or revised and reissued. However, the Office of Fair Housing and Equal Opportunity has determined that the guidance identified below should not be enforced or otherwise relied upon by the Department or stakeholders while this review is ongoing. Accordingly, the Office of Fair Housing and Equal Opportunity is hereby withdrawing all of the guidance set forth below.

## ANALYSIS

Agencies should not use guidance documents in an attempt to create new rights or obligations that are binding on persons or entities outside of the Federal Government. The Office of Fair Housing and Equal Opportunity is withdrawing the guidance materials identified in this notice through an exercise of the Department's policy-making discretion (i.e., based on a change in Department policy or statutory interpretation. Further:

- The Office of Fair Housing and Equal Opportunity is committed to issuing guidance only where that guidance is necessary and would reduce compliance burdens rather than increase them. Historically, the Office of Fair Housing and Equal Opportunity has at times

released guidance without adequate regard for whether it would increase or decrease compliance burdens and costs. This policy has changed. To effectuate the Office of Fair Housing and Equal Opportunity's new policy preference, the Office of Fair Housing and Equal Opportunity is withdrawing all such guidance , since the Office has found that such guidance fails one of the following three criteria: (1) the guidance is statutorily prescribed, (2) the interpretation therein is consistent with the relevant statute or regulation, and (3) it decreases compliance burdens.

- The Office of Fair Housing and Equal Opportunity does not believe that any reliance interests compel retention of guidance for several reasons. As a threshold matter, parties understand that guidance is generally non-binding and generally does not create substantive rights. In addition, the Office of Fair Housing and Equal Opportunity will deprioritize enforcement against regulated parties whose conduct does not conform to the guidance during the pendency of any withdrawal. Finally, to the extent guidance materials or portions thereof go beyond the relevant statute or regulation, they are unlawful, undermining any reliance interest in retaining that guidance. Where guidance is not per se unlawful, the Office of Fair Housing and Equal Opportunity nonetheless determines that guidance should be withdrawn and that it should be reissued only if the guidance is necessary and only if it reduces compliance burdens. The Office of Fair Housing and Equal Opportunity determines that the benefits of this policy outweigh the cost to any purported reliance interests.

**GUIDANCE WITHDRAWN:**

The below table lists the guidance documents that the Office of Fair Housing and Equal Opportunity is withdrawing from use and the date the guidance was issued. These documents will be immediately removed from active use, and in the interim should not be relied upon as authoritative. Handbooks and internal training materials referencing these guidance documents are being revised. New internal and external guidance will be issued where necessary and appropriate. All of these guidance documents have been removed from the HUD.gov website and should not be relied upon by internal or external parties.

Through this notification, the Department is hereby withdrawing the following guidance materials:

| Title | Date Issued |
|---|---|
| Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons | January 22, 2007 |
| FHEO Notice 2013-01: Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-funded Programs | April 25, 2013 |
| FHEO 2020-01: Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act | January 28, 2020 |
| Implementation of Executive Order 13988 on the Enforcement of the Fair Housing Act | February 11, 2021 |

| | |
|---|---|
| FHEO Statement on the Fair Housing Act and Special Purpose Credit Programs | December 7, 2021 |
| Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real-Estate Related Transactions | June 10, 2022 |
| Implementation of OGC Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records | June 20, 2022 |
| FHEO Memorandum on Source of Income Testing Activities under the Fair Housing Assistance Program | February 12, 2024 |
| Guidance on Application of the Fair Housing Act to the Advertising of Housing, Credit, and Other Real Estate-Related Transactions through Digital Platforms | April 29, 2024 |

The Office of Fair Housing and Equal Opportunity will maintain links to FHEO guidance documents that are still in effect. New guidance will be issued when warranted and this will also be made available on the HUD.gov website.